PRESENT: Lemons, C.J., Goodwyn, Mims, McClanahan, Powell, and Kelsey, JJ., and Millette, S.J.

TEVIN GARY EVANS

                                    OPINION BY
v.     Record No. 141206              JUSTICE D. ARTHUR KELSEY
                                    September 17, 2015

COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

In this criminal case, Tevin Gary Evans entered a conditional guilty plea after the trial court denied his motion to suppress. In his motion, Evans claimed that police officers unlawfully entered his apartment and seized his weapons and drugs. The Court of Appeals denied his petition for appeal. Holding that the officers did not violate the Fourth Amendment, we affirm.

I.

We restate the facts "in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences." Glenn v. Commonwealth, 49 Va. App. 413, 416, 642 S.E.2d 282, 283 (2007) (en banc) (citation omitted), aff'd, 275 Va. 123, 654 S.E.2d 910 (2008). This standard requires us "to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Jones v. Commonwealth, 279 Va. 521, 528, 690 S.E.2d 95, 99 (2010) (citation omitted).

While on bicycle patrol, three uniformed police officers smelled a heavy and extremely strong odor of marijuana coming from an apartment window. A police detective, who later arrived on the scene, testified at trial that the officers reported smelling "burnt" marijuana. On

brief, Evans concedes that "[i]n the instant case, it was undisputed that the officers smelled the odor of burning marijuana" emanating from his apartment. See Appellant's Br. at 10.[1]

The officers knocked on the apartment door three times, and Evans' mother answered each time. During the first encounter, the officers asked "questions about someone smoking" and explained to her the "heavy odor of marijuana" that they smelled. During the second encounter, Evans' mother appeared to be "shaking" and "nervous." She exclaimed, "Ain't nobody smoking weed in here," and then "slammed" the door in the "face" of one of the officers. During this brief episode, the officers smelled the odor of marijuana "like a gust of wind" coming from inside the apartment.

When knocking on the door the third time, the officers "announced out loud it was the police." No one answered the door for about five minutes. During this period, the officers heard unspecified movement inside the apartment. After Evans' mother finally opened the door, she quickly tried to close it again. Another strong marijuana odor wafted through the doorway.

Concluding that exigent circumstances existed at this point, one of the officers put his hand on the door to prevent it from closing, and as he did so, he told Evans' mother that he was coming in to investigate. The officer then entered the apartment and observed in plain view "a burnt marijuana blunt" and marijuana residue. When asked by the officers if there was marijuana in the apartment, Evans' mother admitted, "My son was smoking a blunt," and offered, "I'll get it for you."

Shortly thereafter, an investigator asked for and received written consent from Evans and his mother to search the apartment. In their subsequent search, investigators found cocaine,

---

[1] Without mentioning this concession, Evans' counsel contended otherwise at oral argument on appeal. See Oral Argument Audio at 1:24 to 1:28. We accept Evans' concession on brief as the fairest inference from the facts of this case.

2

morphine, a loaded Glock handgun previously reported as stolen, a loaded Taurus handgun, three boxes containing a total of 119 rounds of ammunition, and a revolver in a container along with 6 rounds of ammunition. They also discovered plastic sandwich bags and over $1,000 in cash.

At the suppression hearing, Evans conceded that the officers had probable cause to believe that marijuana was in the apartment. Id. at 103.[2] He argued, however, that his consent, as well as his mother's, should be deemed invalid because the officers entered their apartment without a proper showing of exigent circumstances. According to Evans, the police, by announcing their presence and their awareness of a heavy odor of marijuana, created the exigency wholly by police action. Evans concluded the suppression argument with the assertion that the police officers "wholly set up" the circumstances in which "foreseeable evidence would be destroyed."[3]

Evans cited United States v. Mowatt, 513 F.3d 395 (4th Cir. 2008), as authority for his position. Evans failed to mention, however, that the United States Supreme Court in Kentucky v. King, 563 U.S. 452, ___, 131 S. Ct. 1849, 1859-62 (2011), expressly rejected Mowatt, along with a host of other lower court opinions that adopted the so-called "police-created exigency doctrine" and expanded the exceptions to exigent circumstances beyond "actual or threatened

---

[2] Notwithstanding this concession, the trial court's letter opinion suggested that probable cause to enter the apartment did not exist because the "patrol officers could not localize the marijuana smell to a person." J.A. at 29 (relying on a flawed interpretation of Bunch v. Commonwealth, 51 Va. App. 491, 658 S.E.2d 724 (2008), which involved a warrantless arrest of an individual rather than a warrantless entry into a premises). We need not discuss this issue further because Evans conceded on appeal that he does not challenge probable cause in this case. See Appellant's Br. at 10; Oral Argument Audio at 3:51 to 3:56.

[3] Evans specifically addressed the degree of urgency factor that courts consider when determining the existence of exigent circumstances. The "degree of urgency involving the amount of time necessary to obtain a search warrant," Evans admitted, "[is] no more or no less than any other case." Evans thus conceded that this factor did "not lean one way or the other."

violation[s] of the Fourth Amendment" by police. Neither the Commonwealth nor the trial court corrected Evans on this point.

The trial court denied Evans' motion to suppress, holding that his consent, as well as his mother's, was voluntarily and freely given. Evans then made a conditional plea of guilty to charges of cocaine distribution and unlawful possession of a firearm while in possession of cocaine. The guilty pleas were conditioned upon the preservation of Evans' right to appeal the trial court's adverse ruling on his motion to suppress.

In a per curiam order, a judge of the Court of Appeals denied Evans' petition for appeal, stating that "on this record, we cannot say the trial court's factual finding that appellant voluntarily consented to the search was plainly wrong." Evans v. Commonwealth, Record No. 1965-13-1, slip op. at 4 (Apr. 24, 2014) (unpublished). Upon further review, a three-judge panel of the Court of Appeals agreed that the petition for appeal should be denied. Evans v. Commonwealth, Record No. 1965-13-1, slip op. at 1 (July 22, 2014) (unpublished). Evans now appeals to us, claiming both the trial court and the Court of Appeals erred.

II.

We see no need to address the attenuation principle as it relates to consensual searches. See generally Warlick v. Commonwealth, 215 Va. 263, 267, 208 S.E.2d 746, 749 (1974) (finding connection between the illegality and consensual confession "so attenuated . . . as to dissipate the taint"). In this case, there was no predicate illegality. Probable cause and exigent circumstances authorized the warrantless entry by the officers into the apartment — thus undermining the essential first premise of Evans' challenge to the validity of the later consensual search.[4]

---

[4] It is particularly unnecessary to address the voluntariness of Evans' consent, because consent given by Evans' mother, if voluntary, would be sufficient to authorize the entry. See Georgia v. Randolph, 547 U.S. 103, 122-23 (2006). In this case, the trial court found that the

4

A.

No fixed legal definition fully captures the meaning of exigent circumstances. Police officers find themselves in a myriad of situations with varied fact patterns. No court could provide an exhaustive enumeration of factors that would distinguish circumstances that qualify as exigent from those that would not.[5] The best that we can do is to consider a few commonalities and then make a practical, commonsense judgment.

One rather obvious commonality is that someone with illegal drugs would prefer not to be caught with them. That desire is at its apogee when the police are right on the verge of doing just that. Scores of cases have observed that one possessing illegal drugs in an apartment or home would quite likely try to get rid of them upon realizing that the police are at the front door inquiring about the distinct odor of the drugs coming from inside.[6]

---

consent given by Evans' mother was voluntary, based in no small part on the fact that she "knew how to say no to a policeman" when "she shut the door in [the officer's] face twice and tried to do it a third time." See generally Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973) (observing that, absent a misapplication of law, consent is a factual question best answered by the trial judge as factfinder).

[5] While noting several relevant factors to consider, we have traditionally disclaimed any effort "to formulate a final and comprehensive list of all exigent circumstances which might justify a warrantless entry." Verez v. Commonwealth, 230 Va. 405, 410, 337 S.E.2d 749, 753 (1985). Consistent with this case, two of the illustrative factors identified in Verez include "the officers' reasonable belief that contraband is about to be removed or destroyed" and "information that the possessors of the contraband are aware that the police may be on their trail." Id.

[6] See, e.g., United States v. Tobin, 923 F.2d 1506, 1511 (11th Cir. 1991); State v. Decker, 580 P.2d 333, 336 (Ariz. 1978); Mendez v. People, 986 P.2d 275, 282 (Colo. 1999); Murphy v. State, 898 So. 2d 1031, 1034-36 (Fla. Dist. Ct. App. 2005); People v. Pierini, 664 N.E.2d 140, 144 (Ill. App. Ct. 1996); Posey v. Commonwealth, 185 S.W.3d 170, 173 (Ky. 2006); State v. Brisban, 809 So. 2d 923, 928-29 (La. 2002); Gorman v. State, 897 A.2d 242, 252-53 (Md. Ct. Spec. App. 2006); State v. Rodriguez, 945 A.2d 676, 681-83 (N.H. 2008); State v. Luong, 977 N.E.2d 1075, 1081-82 (Ohio Ct. App. 2012); State v. Hughes, 607 N.W.2d 621, 628 (Wis. 2000); Rideout v. State, 122 P.3d 201, 207-08 (Wyo. 2005); cf. United States v. Moses, 540 F.3d 263, 271 (4th Cir. 2008); United States v. Esparza, 162 F.3d 978, 980 (8th Cir. 1998); United States v. Vasquez, 638 F.2d 507, 531-32 (2d Cir. 1980).

The Fourth Circuit Court of Appeals has twice addressed this exact scenario. In United States v. Grissett, 925 F.2d 776 (4th Cir. 1991), uniformed police officers knocked on a door of a motel room and identified themselves as police. When the door opened, they "smelled the odor of marijuana wafting through the open doorway" of the motel room. Id. at 778. Because it was obvious that everyone in the room now knew the police were aware of the marijuana, it was equally obvious to the officers that the moment they closed the door, those in the room would do whatever they could to get rid of any illegal drugs they possessed. The officers then entered the motel room and discovered marijuana and cocaine.

In response to the assertion that exigent circumstances did not justify the warrantless entry, the Fourth Circuit flatly disagreed. "Exigent circumstances can arise when the evidence might be destroyed before a search warrant could be obtained." Id. Because the "police had identified themselves" to the occupants of the room, "an officer could reasonably conclude that the occupants of the room would attempt to dispose of the evidence before the police could return with a warrant. This is especially true in the case of an easily disposable substance like drugs." Id. After all, Grissett emphasized, police officers need not "produce concrete proof that the occupants of the room were on the verge of destroying evidence; rather, the proper inquiry focuses on what an objective officer could reasonably believe." Id.

The Fourth Circuit reiterated the Grissett holding in United States v. Cephas, 254 F.3d 488, 496 (4th Cir. 2001). In that case, an officer knocked on the door of an apartment. When it opened, the officer smelled a strong odor of marijuana coming from the apartment. The person opening the door tried to slam it shut when the officer asked to come inside and speak with him. The officer forced his way in and discovered (as in our case) marijuana, cocaine, and firearms. Id. at 490-91.

6

The Fourth Circuit in Cephas identified the dispositive facts: The occupant was "aware that a police officer was on his doorstep," and "marijuana is readily destructible." Id. at 496. Reversing the district court, the Fourth Circuit held as a matter of law that the police officer could have "reasonably believed that the marijuana would have been destroyed had he waited for a warrant. These reasons alone would have justified his warrantless entry." Id. (emphasis added).

B.

In this case, two facts establish exigent circumstances prior to the officers' entry into the apartment: first, the cloud of heavy and extremely strong marijuana odors, some of which blew through the open doorway "like a gust of wind," and, second, the contemporaneous knowledge of Evans' mother that the investigating officers at her doorway smelled the marijuana, which would naturally give her a potent incentive to destroy, discard, or hide the illegal drug (or ask others to do so) soon after she closed the door. By themselves, these facts establish exigent circumstances based upon Grissett, Cephas, and a host of analogous cases. See supra note 6.[7]

Those facts, while sufficient in themselves, are not the only facts in this case demonstrating exigent circumstances prior to the officers' entry into the apartment. After one of the officers explained to Evans' mother that they smelled marijuana coming from the apartment window (even as the odor continued to pour through the doorway), she slammed the door in his face. She was noticeably shaking and nervous as she did so.

---

[7] In response, Evans relies on United States v. Ramirez, 676 F.3d 755 (8th Cir. 2012). See Oral Argument Audio at 5:58 to 6:24, 12:14 to 12:48. He cites Ramirez as an example of "mere supposition" posing as exigent circumstances. Appellant's Br. at 13. Evans fails to appreciate that, in Ramirez, there was no evidence that the occupants of the room knew the police were actively investigating their crimes. Ramirez, 676 F.3d at 763 ("There is no evidence supporting the inference that these men knew the police were tracking them at all, which might lend credence to that line of reasoning as it relates to the imminent destruction of evidence.").

7

If the officers had made up the assertion without any basis simply to provoke her, slamming the door would have been an understandable nonverbal rebuke. But given that everyone at the doorway, including Evans' mother, could simultaneously smell the odiferous cloud of marijuana, her statement, "Ain't nobody smoking weed in here," was little more than an unintentional apophasis worthy of the Bard's retort: "The Lady doth protest too much, methinks."[8]

Her inept remark, followed by slamming the door, implied that Evans' mother knew the police officers were aware that marijuana was present in the apartment, and she needed a little time and privacy to do something about the problem. See, e.g., United States v. Urrego de Soto, 885 F.2d 354, 368 (7th Cir. 1989) (finding exigent circumstances and holding that the threat of destruction of evidence justified a warrantless entry of an apartment when the occupant responded to an officer's knock and identification by "attempt[ing] to slam the door in [the officer's] face").[9]

Equally telling is the fact that Evans' nervous and shaking mother waited about five minutes before opening the door following the third knock. During that time frame, one of the officers heard movement, though he did not know who was moving about or what was being moved. Evans' mother had promptly answered the door twice before; why would she not do so on the third occasion? Perhaps Evans' mother was simply tired of talking to the police. But the

---

[8] William Shakespeare, Hamlet, act 3, sc. 2 (1606).

[9] See also United States v. Moreno, 701 F.3d 64, 74-75 (2d Cir. 2012) (finding that "'suddenly and forcefully' attempting to slam shut a door [appellant] had just opened . . . raised a legitimate concern that she would attempt to destroy or discard the drugs"); Cephas, 254 F.3d at 496; United States v. Scroger, 98 F.3d 1256, 1258-60 (10th Cir. 1996); People v. Baker, 813 P.2d 331, 333 (Colo. 1991); State v. Pool, 652 P.2d 254, 256-57 (N.M. Ct. App. 1982).

8

more realistic hypothesis is that she was informing her son (who she later said had been smoking a marijuana blunt at the time) of the presence of the police at the front door.

The conspicuously delayed response of Evans' mother, coupled with unspecific sounds of movement, contributes to the totality of facts demonstrating exigent circumstances. See, e.g., United States v. Aguirre, 664 F.3d 606, 612 (5th Cir. 2011) (finding that the lack of response when the officers knocked and announced themselves followed by noises inside the home contributed to the totality of exigent circumstances); Cherry v. Commonwealth, 44 Va. App. 347, 368, 605 S.E.2d 297, 307 (2004) (holding that unidentified "significant movement" heard inside the house was an additional fact contributing to the totality of exigent circumstances).[10]

Contesting this conclusion, Evans argues that a factually anemic "mere supposition" of exigent circumstances should be disregarded. See Appellant's Br. at 13. We agree. But that does not mean that irrefutable proof, or anything even close to that, is required. A far lower standard applies. Under settled law, "an exigent circumstance exists justifying such an entry where the law enforcement officers have probable cause to believe that it is necessary to prevent destruction of evidence." Keeter v. Commonwealth, 222 Va. 134, 141, 278 S.E.2d 841, 846 (1981). "If they had probable cause so to believe, their entry was justified." Id.

When used as a standard of calibrating certitude, "[t]he very phrase 'probable cause' confirms that the Fourth Amendment does not demand all possible precision." Herring v. United States, 555 U.S. 135, 139 (2009). To be sure, probable cause is "less demanding than a standard requiring a preponderance of the evidence," United States v. Ortiz, 669 F.3d 439, 446 (4th Cir.

---

[10] On brief, Evans claims that his argument against exigent circumstances in this case finds support in Johnson v. United States, 333 U.S. 10 (1948). Evans adds that King "reaffirmed the continued validity of the holding in Johnson." Appellant's Br. at 12. Evans overlooks, however, that King distinguished Johnson as "simply not a case about exigent circumstances." King, 563 U.S. at ___ n.5, 131 S. Ct. at 1861 n.5.

2012), and "does not demand any showing that such a belief be correct or more likely true than false," Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion).

Thus, "the proper inquiry focuses on what an objective officer could reasonably believe." Grissett, 925 F.2d at 778; see also Cephas, 254 F.3d at 496 (holding that it was sufficient that the officer "reasonably believed that the marijuana would have been destroyed"). As Professor Bacigal has explained, courts "must assess the probability that someone will act to destroy the evidence. If the defendant himself has the power to destroy the evidence, the courts assume that he is likely to avail himself of the opportunity." Ronald J. Bacigal, Virginia Practice: Criminal Procedure § 4:22, at 119-20 (2014-2015 ed.). In this respect, the certitude of probable cause is measured by a "flexible, common-sense standard." Brown, 460 U.S. at 742.[11]

### C.

Finally, we must address Evans' assertion in the trial court that the police, by announcing their presence and their awareness of a heavy odor of marijuana, created the exigency wholly by police action, which, Evans concluded, "wholly set up" the circumstances in which "foreseeable evidence would be destroyed."[12] This argument, after having gained some traction among lower

---

[11] We acknowledge the concern expressed by the dissent for our use of the word "hypothesis" in this context. See Post at 14, 24. A "hypothesis," however, is simply a "supposition based on evidence but not proved; a proposed explanation, supported by evidence, that serves as a starting point for investigation." Black's Law Dictionary 861 (10th ed. 2014) (emphasis added). It is an apt word to describe the conceptual structure of probable cause. See, e.g., United States v. Shepherd, 714 F.2d 316, 323 (4th Cir. 1983) (noting that the police officer's investigatory "hypothesis" justifying "probable cause" was "proved correct"). The word tells us nothing, of course, about the level of certitude that must accompany the "supposition based on evidence," Black's Law Dictionary at 861, but settled law does. The threshold level of certitude is less than a preponderance of the evidence, supra at 9-10, and "requires only a probability or substantial chance" that the hypothesis is correct, "not an actual showing" that it is in fact correct. Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983).

[12] The trial court's letter opinion stated that "[f]or purposes of the [suppression] motion," J.A. at 29, the court would treat the officers' entry as illegal. The Court of Appeals noted, but did not expressly address, this question. It is unclear whether either court agreed with Evans'

courts, was expressly rejected by King, 563 U.S. at ___, 131 S. Ct. at 1859-62. Writing for an

eight-member majority in King, Justice Alito explained:

> [I]n the vast majority of cases in which evidence is destroyed by persons who are engaged in illegal conduct, the reason for the destruction is fear that the evidence will fall into the hands of law enforcement. Destruction of evidence issues probably occur most frequently in drug cases because drugs may be easily destroyed by flushing them down a toilet or rinsing them down a drain. Persons in possession of valuable drugs are unlikely to destroy them unless they fear discovery by the police. Consequently, a rule that precludes the police from making a warrantless entry to prevent the destruction of evidence whenever their conduct causes the exigency would unreasonably shrink the reach of this well-established exception to the warrant requirement.

Id. at ___, 131 S. Ct. at 1857.

It must be remembered, King reiterated, "[t]he ultimate touchstone of the Fourth

Amendment is 'reasonableness.'" Id. at ___, 131 S. Ct. at 1856 (quoting Brigham City v. Stuart,

547 U.S. 398, 403 (2006)). On the issue of warrantless entries, "the Fourth Amendment's text

endorses no absolutes. It instead condemns only 'unreasonable' searches and seizures." Kyer,

45 Va. App. at 480, 612 S.E.2d at 217. The Fourth Amendment, after all, does not expressly

require warrants. Rather it implies a "presumption" that "a warrant must generally be secured."

King, 563 U.S. at ___, 131 S. Ct. at 1856. This rebuttable presumption can be "overcome" by

judicially recognized "reasonable exceptions." Id. This point is not a rhetorical digression — it

is central to this case. Plainly put, "warrantless searches are allowed when the circumstances

---

theory of a police-created exigency or simply assumed it arguendo. For our purposes, it does not matter. Appellate courts do "not review lower courts' opinions, but their judgments." Jennings v. Stephens, ___ U.S. ___, ___, 135 S. Ct. 793, 799 (2015). A lower court's judgment, if legally correct, will be affirmed even if we were to disagree with the lower court's legal reasoning. Perry v. Commonwealth, 280 Va. 572, 580, 701 S.E.2d 431, 436 (2010). For over a century, Virginia has followed "the settled rule" that however erroneous "may be the reasons of the court for its judgment upon the face of the judgment itself, if the judgment be right, it will not be disturbed on account of the reasons." Schultz v. Shultz, 51 Va. (10 Gratt.) 358, 384 (1853).

make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement." Id. at ___, 131 S. Ct. at 1858.

Applying these principles, King specifically addressed whether the exigent circumstances rule "applies when police, by knocking on the door of a residence and announcing their presence, cause the occupants to attempt to destroy evidence." Id. at ___, 131 S. Ct. at 1854. The lower court in King had adopted a version of the police-created exigency theory, holding that "the exigent circumstances rule does not apply in the case at hand because the police should have foreseen that their conduct would prompt the occupants to attempt to destroy evidence." Id. The Supreme Court's response to this view was unequivocal: "We reject this interpretation of the exigent circumstances rule." Id.

King explained that the judicial "adoption of a reasonable foreseeability test would . . . introduce an unacceptable degree of unpredictability" when officers knock on the doors of those suspected to possess drugs because there is always a "possibility that the occupants may possess drugs and may seek to destroy them." Id. at ___, 131 S. Ct. at 1859. Under such a test, it would then "be necessary to quantify the degree of predictability that must be reached before the police-created exigency doctrine comes into play," creating "unacceptable and unwarranted difficulties for law enforcement officers who must make quick decisions in the field." Id. at ___, 131 S. Ct. at 1859-60.

King stated that some lower courts had "fault[ed] law enforcement officers if, after acquiring evidence that is sufficient to establish probable cause to search particular premises, the officers do not seek a warrant but instead knock on the door and seek either to speak with an occupant or to obtain consent to search." Id. at ___, 131 S. Ct. at 1860. King rejected this approach because it "unjustifiably interferes with legitimate law enforcement strategies" and

12

fails to appreciate that "[t]here are many entirely proper reasons why police may not want to seek a search warrant as soon as the bare minimum of evidence needed to establish probable cause is acquired." Id.

In short, Evans' argument in the trial court was simply a rhetorical restatement of the same police-created exigency theories rejected by King. The argument erroneously leads Evans to discount the exigent circumstances existing prior to the officers' entry into his apartment.[13] Under King, the exigent circumstances rule cannot be truncated in this manner.

It is true, as Evans contends, that a mere knock by police on the door of a suspect's residence, by itself, does not constitute exigent circumstances. This unremarkable point, however, presupposes the absence of other facts — like those present in this case:

- a cloud of heavy and extremely strong marijuana odors, some of which blew "like a gust of wind," past police officers and Evans' mother through an open doorway;

- a suspiciously volunteered denial ("Ain't nobody smoking weed in here") by Evans' nervous and shaking mother in the face of the obvious fact that police officers smelled marijuana odors blowing through the doorway;

- a door slammed by Evans' mother in the face of police officers in response to their further inquiries;

- sounds of unspecified movement inside the apartment after the door was slammed shut; and

---

[13] Evans makes the same conceptual error in his efforts to distinguish Grissett and Cherry from this case. Both opinions adopted the reasonable foreseeability limitation on the exigent circumstances doctrine, a view Evans explicitly advanced in the trial court and implicitly advances on appeal. That aspect of Grisset and Cherry was rejected by King, 563 U.S. at ___, 131 S. Ct. at 1859-60. See Grissett, 925 F.2d at 778 (noting that "the officers could not have known in advance that their conduct would precipitate an emergency involving the probable destruction of evidence" because they "identified themselves before smelling the marijuana"); Cherry, 44 Va. App. at 362-63 (quoting the reasoning in Grissett and finding "the exigencies were not of [the officer's] own making" because he was investigating an unrelated offense and did not smell the burning marijuana until after an occupant opened the door).

13

- a conspicuously delayed response by anyone in the apartment to additional knocks on the door by the investigating officers.

It is an over-generalization, at best, for Evans to characterize these facts as a mere knock-on-the-door case.

### III.

In sum, both probable cause and exigent circumstances justified the warrantless entry by the police officers into Evans' apartment to thwart the objectively reasonable possibility that evidence would be destroyed, discarded, or hidden if they did not take immediate action. The trial court did not err in denying Evans' motion to suppress, and the Court of Appeals did not err in denying Evans' petition for appeal.

Affirmed.

JUSTICE MIMS, with whom JUSTICE GOODWYN and SENIOR JUSTICE MILLETTE join, dissenting.

Today, the majority permits the government to dispense with the constitutional requirement to obtain a warrant before entering a private residence if law enforcement officers have probable cause to suspect criminal activity, make contact with an occupant, and announce their suspicions before entering.

The majority grounds this holding on a "hypothesis": if occupants possess evidence and know that officers suspect criminal activity, they will immediately take steps to destroy the evidence. However, hypotheses do not satisfy "the fact-specific nature of the reasonableness inquiry" under the Fourth Amendment. Because the Fourth Amendment requires a warrant to enter a private residence in this context, I must dissent.

14

## I. Background

"[E]ach case of alleged exigency" that would justify a warrantless entry turns "on its own facts and circumstances." Missouri v. McNeely, ___ U.S. ___, ___, 133 S. Ct. 1552, 1559 (2014) (internal quotation marks and citation omitted). An officer's subjective motivation or intent is irrelevant to determining whether the Fourth Amendment has been violated. See Brigham City v. Stuart, 547 U.S. 398, 405 (2006) ("It therefore does not matter here . . . whether the officers entered the kitchen to arrest respondents and gather evidence against them or to assist the injured and prevent further violence."). The circumstances, viewed objectively, must justify the officer's actions. Id. at 404; see Keeter v. Commonwealth, 222 Va. 134, 141, 278 S.E.2d 841, 846 (1981). The facts are not in dispute.

On May 22, 2013, while on uniformed bike patrol in Norfolk's Denby Park neighborhood, Officers Hathaway, Giraudo, and O'Rourke noticed a strong marijuana odor apparently coming from an open window on the second floor of an apartment building. The officers decided to investigate. They tried to open the front door of the building, expecting it to open into a common interior hallway with two upstairs and two downstairs apartments. The door was locked, however, so Officer O'Rourke knocked.

Alice Evans, the defendant's mother, answered the door. The officers explained that they were investigating the marijuana odor that appeared to be coming from the building. The officers also asked about the building's layout. Ms. Evans explained that, unlike the other apartment buildings in the complex, the building contained only a single, two-story apartment. Then, she closed the door.

Officer Giraudo walked around to the rear of the apartment, under the open window, where he observed the odor of marijuana again. After Officer Giraudo circled back to the front

15

of the apartment, Officer O'Rourke knocked a second time. Ms. Evans opened the door, and Officer O'Rourke told her that the officers could smell marijuana coming from the apartment. Ms. Evans stated: "Ain't nobody smoking weed in here." Then, she quickly closed the door. As she closed the door, Officer Hathaway smelled the odor of marijuana coming from the apartment.

Officer Giraudo knocked next. Ms. Evans was slow to respond — about five minutes passed before she opened the door. During this time, the officers heard "normal movement" inside the apartment. When she opened the door and saw the officers, she immediately tried to close the door a third time. Officer Hathaway put his hand on the door and placed his foot inside the apartment to prevent her from closing the door. As he did, he told Ms. Evans that "she couldn't close the door on [the officers]." Officer Giraudo told Ms. Evans that he was "coming in to continue [the] investigation."

At this time, Officer Giraudo and Officer O'Rourke were standing in front of Officer Hathaway as he propped the door open with his hand and foot. As Officer Giraudo entered the apartment, he saw a person running up the stairs to the second floor and he gave pursuit.

On the second floor, Officer Giraudo encountered the defendant, Tevin Gary Evans ("Evans") — who was not the person he had pursued — coming out of a bedroom. He drew his gun and directed Evans to show his hands, turn away, and walk backwards towards him. Officer Hathaway then handcuffed Evans.

Additional officers arrived. These officers detained the Evanses and other individuals from the apartment downstairs while Officers Hathaway, Giraudo, and O'Rourke performed a protective sweep. While checking underneath a bed for additional persons, Officer Hathaway

16

observed what appeared to be marijuana residue on the floor. In the other bedroom, Officer Hathaway observed a still-smoking marijuana blunt on the floor.

After the officers completed the sweep, Officer Giraudo took Ms. Evans outside and asked her if there was any marijuana in the apartment. Ms. Evans conceded that there was and offered to retrieve it. Then Officer Giraudo asked her if there were other illegal narcotics in the apartment. Ms. Evans stated that there were not. Around this time, Officer Hathaway contacted the narcotics division.

Investigator Goins responded to the call. When Goins arrived, Evans was in handcuffs, and there were four or five officers inside the apartment. First, Goins approached Ms. Evans and explained that "based on the circumstances," including the marijuana odor, there may be probable cause to obtain a search warrant. Goins then asked for permission to search the apartment, and Ms. Evans verbally gave her consent. Next, Goins approached Evans, who was still handcuffed, and explained the "situation" to him. When Goins asked for permission to search the apartment, Evans verbally gave his consent. Goins produced a consent form that Evans and his mother signed.[1]

After obtaining their signatures, Goins searched the apartment. During the search, he recovered several grams of crack cocaine, morphine pills, packaging material, three loaded firearms, ammunition, and $1,202 in currency. Goins also recovered a receipt, a summons, and mail linking the items to Evans. After the search was complete, officers placed Evans under

---

[1] The consent form stated:

I, Alice Evans and Tevin Evans, having been informed of my right to refuse to have a search made of my property hereinafter mentioned do hereby authorize Vice & Narcotics Division Investigators members of the Norfolk Police Department, to conduct a search of my property located at 374 Fort Worth Ave Apt. 2.

This written permission is given by me to the above named officer voluntarily and without threats or promises of any kind.

arrest.

## II. Analysis

### A. Fourth Amendment Principles

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. It "protects persons against unreasonable searches of 'their persons [and] houses'" by the government. Minnesota v. Carter, 525 U.S. 83, 88 (1998) (alteration in original).

The Fourth Amendment "draw[s] a firm line at the entrance to the house." Payton v. New York, 445 U.S. 573, 590 (1980); Verez v. Commonwealth, 230 Va. 405, 410, 337 S.E.2d 749, 752 (1985). That line "must be not only firm but also bright." Kyllo v. United States, 533 U.S. 27, 40 (2001). Indeed, "'[a]t the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Id. at 31 (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)). Thus, "[i]t is a 'basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable.'" Kentucky v. King, 563 U.S. 452, ___, 131 S. Ct. 1849, 1856 (2011) (quoting Stuart, 547 U.S. at 403).

Nonetheless, the Fourth Amendment's warrant requirement "is subject to certain reasonable exceptions." Id. For example, officers may enter a home without a warrant to provide emergency assistance, when they are in "hot pursuit," and to prevent the imminent destruction of evidence. See id. (collecting cases); Verez, 230 Va. at 410-11, 337 S.E.2d at 753

18

(listing examples of exigent circumstances). These exceptions are narrowly drawn, however, and as noted, the circumstances must objectively justify the warrantless entrance. United States v. United States Dist. Ct., 407 U.S. 297, 318 (1972) (citing Katz v. United States, 389 U.S. 347, 357 (1967)).

When officers lack a warrant, they must have "probable cause plus exigent circumstances in order to make a lawful entry into a home." Kirk v. Louisiana, 536 U.S. 635, 638 (2002). In this case, for exigent circumstances to exist, "law enforcement officers [must] have probable cause to believe that it is necessary to prevent destruction of evidence." Keeter, 222 Va. at 141, 278 S.E.2d at 846.

The United States Supreme Court recently defined the scope of the exigent circumstances exception in Kentucky v. King, which directs the analysis of this case. When the government alleges that exigent circumstances justify a warrantless entry, the question is whether the officers "engag[ed] or threaten[ed] to engage in conduct that violates the Fourth Amendment" before the exigency arose. King, 563 U.S. at ___, 131 S. Ct. at 1858. If so, the exigent circumstances exception will not justify a warrantless search. See id.

When a claimed exigency cannot justify a warrantless search, the Fourth Amendment is violated. In such cases, the remedy is to exclude the evidence obtained through the violation:

> In order to make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person, . . . this Court held nearly half a century ago that evidence seized during an unlawful search could not constitute proof against the victim of the search.

Wong Sun v. United States, 371 U.S. 471, 484 (1963) (citations omitted). "The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search." Murray v. United States, 487 U.S. 533, 536 (1988) (citation omitted). It "also prohibits the

19

introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as a direct result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" Id. at 536-37 (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)).

Even the voluntary acts of the accused — such as giving consent — may be "insufficient to cure the otherwise unlawful acquisition of evidence." Wong Sun, 371 U.S. at 486 n.12 (citations omitted). Thus, even if the Commonwealth proves that the occupants consented to a search, the Commonwealth must still establish that the given consent was "sufficiently an act of free will to purge the primary taint" of an unlawful, warrantless search. Id. at 486; see also Harris v. Commonwealth, 266 Va. 28, 34, 581 S.E.2d 206, 210 (2003).

With these bedrock principles in mind, I turn to whether exigent circumstances existed when the officers crossed Ms. Evans' threshold, thereby obviating the requirement for a warrant.

### B. Exigent Circumstances

The majority asserts that two facts establish exigent circumstances before the officers' entry into the apartment: (1) the odor of marijuana and (2) "the contemporaneous knowledge of Evans' mother that the investigating officers at her doorway smelled the marijuana." It reasons that Ms. Evans' awareness of the police created the incentive to destroy any evidence of marijuana in the residence, and therefore, the police were justified in entering the residence without a warrant.

However, the odor of marijuana alone does not create an exigency. The odor merely provided the officers with probable cause to suspect that marijuana was in the apartment. See Welsh v. Wisconsin, 466 U.S. 740, 753 (1984) ("[N]o exigency is created simply because there is probable cause to believe that a serious crime has been committed."). Probable cause to

20

believe that a crime is being committed is not sufficient to permit the police to enter a private residence; there must also be exigent circumstances. To rely on the imminent destruction of evidence as justification for a warrantless entry, the police must have probable cause to believe that evidence will be destroyed. See Keeter, 222 Va. at 141, 278 S.E.2d at 846.

The majority's position leads inexorably to the conclusion that police may enter a residence without a warrant provided the officers announce to the occupants that they suspect criminal activity is occurring. The majority reasons that once the occupants of a residence know that the police are at the door and suspect them of a crime, they will "naturally [have] a potent incentive to destroy" any evidence of the crime that they can. In so reasoning, the majority broadens the previously-narrow exigent circumstances exception and gives too little weight to the fact-specific inquiry required by the United States Supreme Court. See McNeely, ___ U.S. at ___, 133 S. Ct. at 1559 (explaining that courts must employ the "finely tuned approach" of considering the "totality of the circumstances" to determine "whether a law enforcement officer faced an emergency that justified acting without a warrant" because "the police action at issue lacks the traditional justification that a warrant provides.").

The Fourth Amendment does not allow the government to create a Hobson's choice for individuals who wish to stand upon their right to exclude officers from their home by arguing that doing so justifies a warrantless search. In other words, when the police announce their presence, an occupant who refuses to allow the officers to enter does not thereby vitiate his constitutional right to do so. See Lefkowitz v. Cunningham, 431 U.S. 801, 807-08 (1977) (the government cannot force a citizen to give up one constitutional right "as the price for exercising another"). The mere fact that an occupant is aware of the officers' presence does not create an exigent circumstance. See King, 563 U.S. at ___, 131 S. Ct. at 1862.

21

In Kinq, officers observed a controlled buy of crack cocaine outside an apartment complex and pursued the suspect into the breezeway of the complex. Id. at ___, 131 S. Ct. at 1854. As the officers entered the breezeway, they heard a door close and detected the odor of marijuana. At the end of the breezeway were the doors to two apartments. The officers did not know which apartment the suspect had entered.

The officers smelled marijuana smoke coming from the apartment on the left. They knocked loudly on that door and identified themselves as police. Immediately, the officers heard people moving and shifting things around, and they concluded that "drug-related evidence was about to be destroyed." They kicked in the door, conducted a protective sweep, and observed marijuana and cocaine in plain view. A subsequent search recovered crack cocaine, cash, and drug paraphernalia. The defendant argued that the officers had created the exigency by announcing their presence, and they therefore could not rely on that exigency to justify the warrantless entry. Id. at ___, 131 S. Ct. at 1854-55.

The Court assumed, arguendo, that an exigency existed under these circumstances, and focused its analysis on whether the officers had created the presumed exigency by violating or threatening to violate the Fourth Amendment before entering the apartment. Id. at ___, 131 S. Ct. at 1862-63. In concluding that the officers had not created the exigency, the Court observed that the record was devoid of any evidence the officers demanded entry to the apartment before circumstances led them to conclude that evidence would be destroyed. Id. at 1863. In fact, the Court found that the officers did not inform the occupants they were going to enter the apartment until after the officers heard noises leading them to believe the occupants would imminently destroy evidence. Id. The Court then remanded the case to the Supreme Court of Kentucky for the fact-specific inquiry regarding whether exigent circumstances genuinely existed when the

22

officers made their warrantless entry.  Id. at ___, 131 S. Ct. at 1864; King v. Commonwealth, 386 S.W.3d 119, 120 (Ky. 2012) (King II).

Significantly, on remand, the Supreme Court of Kentucky concluded that the facts did not support the officers' subjective belief that evidence was about to be destroyed.  King II, 386 S.W.3d at 123.  The court observed that the officers failed to articulate any specific sounds that led them to believe that the occupants were about to destroy evidence.  Id. at 122.  Rather, "the sounds as described at the suppression hearing were indistinguishable from ordinary household sounds."  Id.  In other words, the officers in King, as the officers in this case, heard only "normal movement" and could not point to any facts creating more than "a possibility" that the occupants would destroy evidence.  Id. at 123.

The Supreme Court in King did not suggest that an exigency arises whenever an occupant has "contemporaneous knowledge" of officers at his door who suspect that criminal activity is afoot.  To the contrary, the Court clearly stated that officers do not have carte blanche to enter upon announcing their presence, even if they have probable cause to suspect criminal activity:

> When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do.  And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak. . . . When the police knock on a door but the occupants choose not to respond or to speak, the investigation will have reached a conspicuously low point, and the occupants will have the kind of warning that even the most elaborate security system cannot provide. . . . And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.

King, 563 U.S. at ___, 131 S. Ct. at 1862 (internal quotation marks and citations omitted) (emphasis added).  The Court then stated that officers may enter a residence under the exigent

circumstances exception when occupants "elect to attempt to destroy evidence." Id.[2]

The majority cites additional circumstances to support its conclusion that the officers had probable cause to believe the occupants would imminently destroy evidence of marijuana use before they entered the apartment. The majority points to the fact that Ms. Evans appeared nervous. It notes that she denied anyone was smoking marijuana in the house and slammed the door after answering the officers' questions and responding to their accusations.[3] Finally, the majority observes that it took nearly five minutes for Ms. Evans to answer the door after the third knock. It posits that the most "realistic hypothesis" is that she was telling her son that the police were at the door, presumably so that he could destroy any evidence of marijuana in the apartment. These circumstances, devoid of any additional facts and considered in their totality, are insufficient to support a probable cause suspicion that the occupants would imminently destroy evidence.

Probable cause requires facts creating "'more than [a] bare suspicion'" that an exigency existed given the specific circumstances at hand. United States v. Ortiz, 669 F.3d 439, 445 (4th Cir. 2012) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)). "Exigent circumstances do not deal with mere possibilities," and the Commonwealth is required to show

---

[2] The majority relies on United States v. Grissett, 925 F.2d 776, 778 (4th Cir. 1991), and United States v. Cephas, 254 F.3d 488 (4th Cir. 2001), to support its conclusion that the officers could enter the residence after Ms. Evans became aware of their presence and suspicions. These cases were decided before King, which recognizes that officers who pursue investigations in this manner may give occupants "the kind of warning that even the most elaborate security system cannot provide." King, 563 U.S. at ___, 131 S. Ct. at 1862. In the absence of additional, particularized facts suggesting that the occupants would imminently destroy the evidence, Ms. Evans' "contemporaneous knowledge" of the officers' presence and suspicions is insufficient to create an exigency.

[3] The majority suggests that Ms. Evans "doth protest too much" at the door to her home, and that somehow this contributed to an exigency. Yet perhaps one cannot protest too strenuously when the government seeks to enter her home without a warrant and without consent in violation of the Fourth Amendment. Moreover, her statement was in response to an inquiry from one of the officers at the door.

24

something more than hypothetical supposition and subjective belief.  King II, 386 S.W.3d at 123.

In this case, after the officers spoke with Ms. Evans and learned that the building contained only one apartment, the record shows that at least one of the officers circled the apartment while the others stood outside the front door.  According to the officers, who knocked a second time and then a third time, they were outside the apartment with at least one open window for more than five minutes.  Yet they heard only "normal movement."  None of the officers indicated that they heard Ms. Evans warn the other occupants that the police were outside; none indicated that they heard noises that would suggest the occupants were destroying evidence; and none indicated that they observed the occupants destroying evidence or behaving suspiciously when Ms. Evans opened the door.  This is the precise scenario contemplated by King wherein an occupant "will have the kind of warning that even the most elaborate security system cannot provide."  563 U.S. at ___, 131 S. Ct. at 1862 (internal quotation marks and citation omitted).  Ms. Evans chose to stand upon her Fourth Amendment right.  There are no pre-entry facts tending to indicate that she or the other occupants were about to destroy evidence and thus create an exigency that would justify a warrantless search.[4]

---

[4] The officers did not observe the person run to the second floor until they had already begun to enter the apartment, thereby violating the Fourth Amendment.  Officer Hathaway testified that when he saw the individual begin running, he was holding the door open and Officers Giraudo and O'Rourke were already in front of him.  Officer Giraudo testified that he did not see the person running until he was entering the apartment.

[Officer Giraudo]: I advised Ms. Evans that I could smell marijuana coming from her residence, and that I was coming inside to continue my investigation.

[Defense]: Did you inform her of that immediately upon her opening the door?

[Officer Giraudo]: Yes.

[Defense]: So is it at that time you had told her I am coming in whether you want me to or not?

[Officer Giraudo]: Yes.

25

For these reasons, I conclude that the officers' subjective belief that the occupants would imminently destroy evidence is not supported by the record. Therefore, the officers violated the Fourth Amendment by entering the residence before exigent circumstances arose.

## C. Consent

I next consider whether the Evanses' consent dissipated the taint of the unlawful, warrantless search such that the evidence recovered during the subsequent search by Investigator Goins is nonetheless admissible. The majority, by concluding that exigent circumstances existed, did not reach this question. The inquiry involves two questions: (1) whether the Evanses gave their consent voluntarily and (2) whether their consent was obtained by "'means sufficiently distinguishable to be purged of the primary taint.'"[5] Segura v. United States, 468 U.S. 796, 804-05 (1984) (quoting Wong Sun, 371 U.S. at 488). Ultimately, the second question asks whether the challenged evidence was obtained as the "product" of the initial unlawful search. See id. at 815 (citations omitted).

"Voluntariness is a question of fact to be determined from all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973). The circuit court concluded that the Evanses voluntarily consented to the search conducted by Investigator Goins. In reaching its

. . .

> [Defense]: So as you were stepping in is when you were able to see this individual?

> [Officer Giraudo]: Yes. I heard, you know, foot steps or, you know, on the stairs. I looked up, and that's when I saw very quickly someone disappearing off into the apartment.

[5] Recently, the United States Supreme Court reiterated that "police officers may search jointly occupied premises if one of the occupants consents." Fernandez v. California, ___ U.S. ___, ___, 134 S. Ct. 1126, 1129 (2014). It also explained that Georgia v. Randolph, 547 U.S. 103 (2006) recognized a "narrow exception" to that rule, which provides that "the consent of one occupant is insufficient when another occupant is present and objects to the search." Fernandez, ___ U.S. at ___, 134 S. Ct. at 1129. In the present case, I conclude that neither Evans' consent nor Ms. Evans' consent was sufficiently attenuated from the warrantless entry, and therefore, neither's consent authorized the subsequent search.

conclusion, the circuit court considered the consent form, which both Evans and his mother signed, that stated they had the right to refuse the search. The circuit court also found no indication that Investigator Goins coerced the Evanses.

Nevertheless, it is necessary to determine whether such voluntary consent is sufficiently attenuated to purge the taint of the unlawful encounter and thereby satisfy the Fourth Amendment. Harris, 266 Va. at 34, 581 S.E.2d at 210; see also Commonwealth v. Robertson, 275 Va. 559, 563, 659 S.E.2d 321, 324 (2008) (the appellate court "must determine independently whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment"). Below, the circuit court and the Court of Appeals blurred the analysis of voluntariness with the analysis of attenuation. This was error. If voluntary consent — obtained after an unlawful, warrantless entry — was alone sufficient to purge the taint, "the exclusionary rule would be substantially diluted." Brown v. Illinois, 422 U.S. 590, 602 (1975). Courts must consider the evidence's "admissibility in light of the distinct policies and interests of the Fourth Amendment." Id.; see Harris, 266 Va. at 34, 581 S.E.2d at 210.

The Commonwealth argues that the later search was sufficiently attenuated from the initial unlawful search. It reasons that the initial entry was not made to obtain consent and the seized evidence was unrelated to the odor of marijuana that led the officers to investigate in the first place. The Commonwealth also contends that Investigator Goins' arrival severed the causal chain of events. I disagree.

The United States Supreme Court has considered the following factors to determine whether a voluntary act is sufficiently attenuated from the primary taint: (1) the temporal proximity between the unlawful action and the voluntary act; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. Brown, 422 U.S. at

27

603-04. This Court has considered similar factors. See Harris, 266 Va. at 33-34, 581 S.E.2d at 210 (concluding that the trial court erred when it denied the defendant's motion to suppress, citing the continuous nature of an encounter, circumstances indicating that the defendant was not free to leave, and the direct relationship between the search and the evidence recovered). No single factor is determinative, and these factors are not exhaustive.

In this case, the officers obtained consent during a continuous encounter. It is unclear from the record exactly how much time passed between the initial entry and when the Evanses gave their consent, but the circuit court found that the interval was "brief." During the intervening period, one officer drew his weapon on Evans, another handcuffed him, and four or five officers entered his home. Immediately thereafter, Officer Hathaway called the narcotics division. After responding to the scene, Investigator Goins explained the "situation" to a still-handcuffed Evans.[6] At this point, four or five officers remained in his residence, detaining the other individuals, including Ms. Evans. These events "flowed one from the other with no discernable break in the chain of causation." Davis v. Commonwealth, 37 Va. App. 421, 435, 559 S.E.2d 374, 381 (2002). Further, these circumstances plainly indicate that Evans, with his hands cuffed behind his back, "was not free to leave or disregard the officer's inquiry." Harris, 266 Va. at 34, 581 S.E.2d at 210.

Similar concerns extend the taint to the consent given by Ms. Evans. During the sweep, the officers detained Ms. Evans, and immediately after the sweep, Officer Giraudo began questioning Ms. Evans about the presence of marijuana and other drugs in the apartment. Clearly, Ms. Evans was as much the subject of an investigation as her son. Investigator Goins

---

[6] Investigator Goins did not remove the handcuffs until it was time for Evans to sign the consent form. Also, the Commonwealth's argument that the arrival of more police officers interrupted the chain of events lacks merit.

confirmed as much, as he testified that both were actively under investigation when he arrived. Even though the consent form stated that the Evanses were free to withhold their consent, the circumstances plainly indicated otherwise. Officers Hathaway, Giraudo, and O'Rourke had already overrun Ms. Evans' previous attempts to withhold her consent at the threshold to her residence. Officer Giraudo had previously told her that she had no choice and that the officers were "coming in to continue [the] investigation" even though she had refused to speak with them. Now, under investigation, with numerous police officers in her home, Investigator Goins offered her a choice between a consensual search and a search pursuant to a warrant. Under these circumstances, a reasonable person would still feel constrained by the initial warrantless entry. See Davis, 37 Va. App. at 431, 559 S.E.2d at 379 ("When confronted with an accusation from police, such as, 'we know you are selling drugs from this location, let us search you,' no reasonable person would feel free to leave.").

Finally, the Commonwealth's argument that the seized evidence was unrelated to the purpose of the entry is unpersuasive. Immediately after the protective sweep, Officer Hathaway called the narcotics division, and Officer Giraudo began questioning Ms. Evans about the presence of narcotics besides marijuana in the house. The potential presence of narcotics was the sine qua non of the officers' investigation. The unlawful, warrantless entry, during which officers observed a smoldering marijuana cigarette and marijuana residue, further encouraged the officers to seek either a warrant or the Evanses' consent to pursue a more intensive search. For all these reasons, the Evanses' consent was the tainted fruit of the unlawful warrantless search.

### III. Conclusion

I respectfully dissent. The record is devoid of any facts that create more than a "bare suspicion" that the occupants would destroy evidence. Thus, there was no exigency that would

have justified the officers' warrantless entry. Because the subsequent consent search was insufficiently attenuated from the unlawful, warrantless entry, I would reverse the judgment of the Court of Appeals, vacate Evans' convictions, and remand the case to the Court of Appeals with direction that the case be remanded to the circuit court for further proceedings if the Commonwealth be so advised.