COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Chafin, O'Brien and Malveaux
Argued at Salem, Virginia


EMILY LYNN APONTE

                                                    OPINION BY
v.        Record No. 0052-17-3          JUDGE MARY BENNETT MALVEAUX
                                                    OCTOBER 10, 2017
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF BEDFORD COUNTY
James W. Updike, Jr., Judge

Dirk B. Padgett (Dirk Padgett Law PLLC, on brief), for appellant.

Donald E. Jeffrey, III, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


        Emily Lynn Aponte ("appellant") appeals her convictions of involuntary manslaughter, in

violation of Code § 18.2-36.1, driving while intoxicated (second offense within five to ten years)

with a child in her vehicle, in violation of Code §§ 18.2-266 and -270, and maiming of another

resulting from driving while intoxicated, in violation of Code § 18.2-51.4.[1]  On appeal, she contends

the trial court erred when it denied her motion to suppress the certificate of analysis containing her

blood test results, refused to allow her to introduce data evidence at trial, and denied her motion to

---

[1] Appellant was also convicted of child abuse and neglect, in violation of Code
§ 18.2-371.1(A).  Appellant's notice of appeal does not include the case number for her child
abuse and neglect conviction.  "[T]wo aspects of a notice of appeal are mandatory substantive
requirements."  Evans v. Commonwealth, 61 Va. App. 339, 345, 735 S.E.2d 252, 254-55 (2012)
(citation omitted).  First, it must be timely filed; and second, "it must 'adequately identif[y] the
case to be appealed.'"  Id. at 345, 735 S.E.2d at 255 (quoting Roberson v. Commonwealth, 279
Va. 396, 407, 689 S.E.2d 706, 713 (2010)).  Because appellant's notice of appeal does not
adequately identify her child abuse and neglect conviction as a subject of her appeal, we are
without jurisdiction to review that conviction.

strike as the Commonwealth failed to prove appellant was intoxicated at the time of her accident.[2]

For the reasons discussed below, we affirm her convictions.

## I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts [are] stated in the light most favorable to the Commonwealth, the prevailing party at trial." Scott v. Commonwealth, 292 Va. 380, 381, 789 S.E.2d 608, 608 (2016).

### The Accident and Investigation

While driving on the afternoon of April 26, 2014, appellant crossed the center line of a two-lane highway and collided head on with a van. The van's driver suffered injuries which impair his ability to walk and limit his work capacities. Appellant's six-year-old son, E.A., was a passenger in the back seat of her car. E.A. was gravely injured and died several hours after the accident.

Connie Letchford was sitting on her porch that day when, at about 3:00 p.m., she heard "a great big boom." She walked around the side of her home and looked toward the nearby highway, where she saw that a van and car had collided. She ran to the scene, opened appellant's door, asked her if she was okay, and told her she was going to call 911. Appellant said, "please don't. . . . [P]lease don't call. I've been drinking."

Appellant got out of her car and tried to phone her husband. When Letchford completed her call to 911, she turned around and saw appellant holding three or four cans of beer. Letchford asked appellant what she was doing, and appellant said, "I have to get rid of this" and threw the cans into a wooded area near the road.

---

[2] Appellant raised additional assignments of error concerning her convictions. Her petition for appeal was denied on those assignments of error.

Connie Letchford's daughter-in-law, Cheryl Letchford, was with her on the porch that afternoon and also heard the collision. When Cheryl approached the accident scene, appellant "was begging Connie not to call 911 because she would be in so much trouble." She noted that when appellant got out of her car there was a strong odor of beer on her breath. Cheryl Letchford also saw appellant throw away several cans of beer.

Senior Trooper Gordon Musgrove of the Virginia State Police arrived at the scene shortly after 3:00 p.m. Several emergency vehicles were already present, and Musgrove found the scene "fairly hectic" to observe and investigate. He asked appellant for her license and registration and "asked her real quickly" what had happened, but "didn't get that close" to appellant. Appellant told Musgrove that E.A. had asked her a question, and when she looked back to answer him, the accident occurred. Appellant's husband arrived at the scene, E.A. was airlifted to a Roanoke hospital, and appellant and her husband asked if they could leave. At approximately 3:45 p.m., Musgrove told them to drive to the hospital and that he would later meet them there.

Shortly thereafter, Musgrove spoke with two other troopers who had talked with Connie Letchford. Apprised of their conversation, Musgrove walked to the wooded area and saw three cans of beer. Musgrove also spoke with Letchford and heard her account of appellant's conduct and statements. Prior to that time, Musgrove had not been concerned that alcohol might have played a role in the accident.

After completing his work as lead investigator of the accident, Musgrove left the scene shortly after 5:20 p.m. and arrived at the hospital just before 6:00 p.m. He went to the pediatric intensive care unit and spoke briefly with E.A.'s doctor before speaking again with appellant at about 6:15 p.m. Musgrove could detect a slight odor of alcohol in the room where he and appellant spoke. Appellant repeated her account of the accident and denied having anything to drink after the crash. She stated her last drink had occurred at about 3:00 a.m. or 4:00 a.m.

Musgrove, giving appellant "the benefit of the doubt" that 14 or 15 hours had passed since her last drink, offered appellant a breath test to see if any alcohol remained in her system. At about 6:23 p.m., appellant's breath test returned a blood alcohol content ("BAC") result of .130. Based on appellant's account of her conduct, the result seemed high to Musgrove. Appellant's husband was present, and he asked Musgrove if his Alco-Sensor was working properly. Another trooper, who was investigating a different accident, was in the emergency room at that time and Musgrove asked if he would administer a second test using that trooper's Alco-Sensor. At approximately 6:30 p.m., that breath test returned a result of .109 BAC.

Musgrove asked appellant what she had to drink the night before. Appellant said she had consumed part of a mixed drink and some beer—"a lot more than normal"—and that, as a consequence, she had spent the previous night at the home of her mother's friend. At that point, after approximately 30 minutes of conversation with appellant, Musgrove contacted the Commonwealth's attorney for guidance. Since more than three hours had elapsed since the accident, the statutory window for implied consent for a blood draw had passed[3] and the Commonwealth's attorney advised Musgrove to see if appellant would consent to give a blood sample. He also advised the trooper that if appellant did not consent, there was sufficient probable cause for Musgrove to take her before a magistrate and obtain a search warrant for her blood.

Musgrove told appellant she could voluntarily provide a blood sample, which would allow her to remain in the hospital and minimize her time away from her son, or they would have

---

[3] Code § 18.2-268.2(A) provides that anyone who operates a motor vehicle upon the Commonwealth's highways "shall be deemed thereby . . . to have consented to have samples of his blood, breath, or both blood and breath taken for a chemical test to determine the alcohol, drug, or both alcohol and drug content of his blood" if he is arrested for various offenses "within three hours of the alleged offense."

to go before a magistrate and obtain a search warrant. Appellant said she would provide a blood sample, and her blood was drawn at 7:15 p.m.

Pre-Trial Motions

Appellant filed a pre-trial motion to suppress the certificate of analysis from her blood sample, alleging that the sample was obtained by coercion and thus violated her constitutional rights. At the motion hearing, appellant testified that when Musgrove asked her to provide a blood sample, she thought she had to comply. She said she remembered hearing that she would be handcuffed and taken before a magistrate if she did not voluntarily provide a blood sample and that she did not know what to do because she did not wish to leave her son. Appellant gave a blood sample because, she thought, "I had no choice or I'd have to be gone."

The trial court also heard the testimony of Trooper Musgrove, as outlined above, and his further testimony that at no time prior to the blood draw did he tell appellant that he would arrest her. He stated he was prepared to handcuff her and take her before a magistrate, but that he did not convey this information to appellant and that he neither handcuffed nor applied any force to her.

The trial court denied the motion to suppress, finding that although the appellant's purported consent to a blood draw was not voluntary, the certificate of analysis was nonetheless admissible because the warrantless blood draw was obtained under exigent circumstances. The trial court stated that it is "a matter of common sense in ordinary human experience [that] . . . the level of alcohol in the body dissipates with the passage of time" and that because of that, Musgrove "might reasonably have believed that he was confronted with an emergency in which the delay necessary to obtain a warrant under the circumstances threatened the destruction of evidence." Further, the trial court noted the "circumstances of what the [t]rooper had been told

by witnesses at the scene and discovered in his investigation and what [appellant] herself had told him."

Appellant also moved for a pre-trial determination of the admissibility of data from her vehicle's airbag control module ("ACM"). Appellant wished to introduce the ACM data to defend against the charge of aggravated involuntary manslaughter. She maintained the ACM's data comprised evidence of speed, brake use, and steering that would bolster her argument that the accident was the result of her momentary inattention, rather than gross, wanton, and culpable conduct.

The trial court found the ACM data was relevant, because it could assist the jury in determining whether appellant's conduct was sufficiently gross, wanton, and culpable as to show a reckless disregard for human life. See Code § 18.2-36.1(B). However, the court also ruled the evidence was inadmissible for two reasons. First, the court concluded the evidence was hearsay because the ACM contained data and information constituting an out-of-court declaration offered for the truth of its content. Second, the court found appellant had failed to carry her burden of showing the evidence was reliable. Consequently, appellant's motion was denied.

<u>Relevant Proceedings at Trial</u>

At trial, Chad Harris of the Virginia Department of Forensic Science testified that he analyzed appellant's blood sample. Harris prepared a certificate of analysis which reflects that at 7:15 p.m. the night of the accident, appellant's BAC was 0.116% by weight by volume. That certificate was entered into evidence.

Also at trial, Dr. Trista Wright of the Virginia Department of Forensic Science testified as an expert in toxicology. She testified to the effects of alcohol consumption on concentration, alertness, vision, coordination, reaction time, and other functions. Dr. Wright explained the process of retrograde extrapolation, which allowed her to work backwards from appellant's BAC

when her blood was drawn at 7:15 p.m. to calculate her approximate BAC at the time of the accident. She also explained that her extrapolation was based on the assumption that appellant did not consume alcohol after the accident. Wright testified that based upon appellant's BAC at 7:15 p.m., her BAC at the time of the accident was between 0.156% and 0.196% by weight by volume, with a midpoint of 0.176% by weight by volume.

After the Commonwealth presented its evidence, appellant moved to strike. That motion was denied. After presenting her own evidence, appellant renewed her motion to strike. That motion also was denied. A jury convicted appellant of involuntary manslaughter, driving while intoxicated (second offense within five to ten years) with a child in her vehicle, maiming of another resulting from driving while intoxicated, and child abuse and neglect. Appellant timely noted her appeal to this Court.

## II. ANALYSIS

### A. Motion to Suppress

Appellant argues that the trial court erred when it denied her motion to suppress the certificate of analysis as no exigent circumstances existed to justify the warrantless blood draw. We disagree.

"In reviewing the denial of a motion to suppress, we 'consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial.'" Hairston v. Commonwealth, 67 Va. App. 552, 560, 797 S.E.2d 794, 798 (2017) (quoting Malbrough v. Commonwealth, 275 Va. 163, 168, 655 S.E.2d 1, 3 (2008)). "It is the appellant's burden to show that when viewing the evidence in such a manner, the trial court committed reversible error." Id. (citation omitted). "The question of whether a . . . seizure violated the Fourth Amendment is 'a mixed question of law and fact that we review *de novo*' on appeal." Id. (quoting Harris v. Commonwealth, 276 Va. 689, 694, 668 S.E.2d 141, 145 (2008)). "An appellate court independently reviews the trial

court's application of relevant legal principles," but in doing so, "the Court 'is bound by the trial court's factual findings unless those findings are plainly wrong or unsupported by the evidence.'" Id. at 560-61, 797 S.E.2d at 798 (quoting Malbrough, 275 Va. at 168, 655 S.E.2d at 3). Further, "we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." Id. at 561, 797 S.E.2d at 798 (quoting McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*)).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches . . . are per se unreasonable, subject to a few well-defined exceptions." Collins v. Commonwealth, 292 Va. 486, 497, 790 S.E.2d 611, 616 (2016) (quoting Abell v. Commonwealth, 221 Va. 607, 612, 272 S.E.2d 204, 207 (1980)), cert. granted, 2017 U.S. LEXIS 4455 (U.S. Sept. 28, 2017) (No. 16-1027). "These narrowly delineated exceptions include: consent, search incident to a lawful arrest, plain view, and exigent circumstances." Id. Our Supreme Court has "recognized several common examples of exigent circumstances such as hot pursuit, the imminent destruction of evidence, and the possibility of danger to others." Id. However, "[n]o fixed legal definition fully captures the meaning of exigent circumstances" because "[p]olice officers find themselves in a myriad of situations with varied fact patterns." Evans v. Commonwealth, 290 Va. 277, 283, 776 S.E.2d 760, 763 (2015). Thus, "[n]o court [can] provide an exhaustive enumeration of factors that would distinguish circumstances that qualify as exigent from those that would not." Id. "When evaluating if exigent circumstances existed, 'the court must examine the circumstances as they reasonably appeared to the law enforcement officer[] on the scene.'" Collins v. Commonwealth, 65 Va. App. 37, 44, 773 S.E.2d 618, 622 (2015) (quoting Verez v. Commonwealth, 230 Va. 405, 411, 337 S.E.2d 749, 753

- 8 -

(1985)), aff'd, 292 Va. 486, 790 S.E.2d 611 (2016), cert. granted, 2017 U.S. LEXIS 4455 (U.S. Sept. 28, 2017) (No. 16-1027).

On brief, appellant argues that for exigent circumstances to exist, an officer must be confronted with an emergency. She maintains that the dissipation of alcohol from the bloodstream does not constitute such an emergency, because although natural dissipation threatens the destruction of evidence, retrograde extrapolation allows a defendant's BAC at the time of an alleged offense to be calculated from a sample taken many hours later. Given this capacity for extrapolation, appellant argues, her BAC could have been calculated as easily from a sample taken later in the evening as it was from the sample drawn at 7:15 p.m. Thus, the Commonwealth cannot demonstrate that Trooper Musgrove faced "an emergency type situation" constituting exigent circumstances, because he could have taken the time to obtain a warrant for the blood draw.

Appellant relies primarily on Missouri v. McNeely, 569 U.S. 141 (2013),[4] arguing that in that case, the Supreme Court found exigent circumstances justifying a warrantless blood draw do not exist simply due to the dissipation of alcohol "without circumstances that suggest[] an actual

---

[4] Appellant also relies on Birchfield v. North Dakota, 136 S. Ct. 2160 (2016), but Birchfield is inapposite. The Birchfield Court addressed blood draws which occur in the search incident to arrest and implied consent contexts, not in the context of the exigent circumstances warrant exception. Id. at 2174 and 2185. Appellant overstates the holding of Birchfield, arguing that "Birchfield now requires a search warrant for the extraction of blood in drunk driving cases." In fact, the Birchfield Court was careful to note that a warrantless blood draw is still constitutionally sound where an exception to the warrant requirement applies and that "[n]othing prevents the police . . . from relying on the exigent circumstances exception." Id. at 2184.

In moving to strike at the conclusion of all the evidence, appellant also offered Bristol v. Commonwealth, 272 Va. 568, 636 S.E.2d 460 (2006), for the proposition that the dissipation of blood alcohol alone cannot support a finding of exigent circumstances because "every instance of a DUI is [then] exigent circumstances." Bristol, however, addressed the exigent circumstances exception to the warrant requirement only in the context of the implied consent statute, Code § 18.2-266.2. The Bristol Court concluded that in that context, finding exigent circumstances based solely on the dissipation of blood alcohol would be error because such a finding would "undermine completely the implied consent provisions" of the statute and "render irrelevant the issue of a driver's consent." Id. at 575-76, 636 S.E.2d at 464.

emergency." In fact, the question certified to the Supreme Court in <u>McNeely</u> was a narrow one—whether the natural metabolization of alcohol presents a *per se* exigency justifying a warrantless, nonconsensual blood draw in all drunk driving cases. <u>Id.</u> at 145. The Court held only that there is no *per se* exigency, with exigency determined "case by case based on the totality of the circumstances." <u>Id.</u>

Although appellant misconstrues <u>McNeely</u>, that case does control our analysis. In <u>McNeely</u>, the Supreme Court relied heavily upon their earlier decision in <u>Schmerber v. California</u>, 384 U.S. 757 (1966). In <u>Schmerber</u>, the defendant was hospitalized after an automobile accident and, once arrested there, was subjected to a nonconsensual, warrantless blood draw. <u>Id.</u> at 758. On appeal, the Supreme Court determined that the blood draw was justified by exigent circumstances, because the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" <u>Id.</u> at 770 (quoting <u>Preston v. United States</u>, 376 U.S. 364, 367 (1964)). The Court noted that "the percentage of alcohol in the blood begins to diminish shortly after drinking stops," and also that "[p]articularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant." <u>Id.</u> at 770-71. Given such "special facts," the Court concluded that the warrantless, nonconsensual blood draw was "an appropriate incident to [the defendant's] arrest." <u>Id.</u> at 771. However, the Court was careful to state that it reached its judgment "only on the facts of the present record." <u>Id.</u> at 772.

In <u>McNeely</u>, the defendant was arrested after exhibiting signs of intoxication during a traffic stop. 569 U.S. at 145. The arresting officer took the defendant to the hospital for a nonconsensual, warrantless blood draw after he indicated he would refuse to submit to a breath test. <u>Id.</u> at 145-46. The trial court granted the defendant's motion to suppress the results of his

blood test, concluding that the exigency exception to the warrant requirement did not apply. Id. at 146. The trial court reasoned that although the defendant's blood alcohol was being metabolized, that circumstance was inherent in every case involving intoxication, and there were no further circumstances suggesting the officer faced a situation in which he could not first have obtained a warrant. Id.

The Missouri Supreme Court affirmed, declining to adopt the state's argument that the dissipation of blood alcohol creates a *per se* exigency. Id. at 147; see also State v. McNeely, 358 S.W.3d 65, 74 (Mo. 2012) (*per curiam*). In so holding, the court relied upon Schmerber, which "reaffirms that . . . exigency is to be determined by the unique facts and circumstances of each case. [It] directs lower courts to engage in a totality of the circumstances analysis" and "requires more than the mere dissipation of blood-alcohol evidence to support a warrantless blood draw." State v. McNeely, 358 S.W.3d at 74. Further, the question of whether circumstances creating an exigency exist "heavily depends on the existence of 'special facts,'" and in "routine DWI cases, in which no 'special facts' exist other than . . . natural dissipation," a warrant is still required. Id. The court determined that unlike Schmerber, the defendant's case was "unquestionably a routine DWI case," lacking "'special facts' of exigency," since "[t]here was no accident to investigate and no injuries to attend to that required the patrolman to expend time." Id.

The McNeely Court affirmed the Missouri Supreme Court, noting its reliance on Schmerber and reiterating the authority of Schmerber's fact-specific, totality of the circumstances inquiry for determining whether exigent circumstances exist to justify a nonconsensual, warrantless blood draw. McNeely, 569 U.S. at 148-51. The Court reviewed its broader exigent circumstances jurisprudence, noting the harmony between Schmerber's analytical framework and the "finely tuned approach" and "fact-specific . . . reasonableness inquiry" utilized in other contexts of exigency. Id. at 150 (citations omitted). The Court also

noted its reliance in Schmerber upon the fact that blood alcohol evidence could have been lost through dissipation over time, particularly where other, "special facts" were also present—*i.e.*, where time was required to investigate the scene of an accident and transport an accused to the hospital.[5] Id. at 151.

In rejecting the state of Missouri's argument that the natural dissipation of alcohol alone constitutes a *per se* exigency, the McNeely Court concluded that "while . . . natural dissipation . . . may support a finding of exigency in a specific case, as it did in Schmerber, it does not do so categorically."[6] Id. at 156. The Court acknowledged that "because an individual's alcohol level gradually declines soon after he stops drinking, a significant delay in testing will negatively affect the probative value of the results." Id. at 152. Further, while retrograde extrapolation permits experts to work backwards from a later blood draw to determine BAC at the time of an alleged offense, "longer intervals may raise questions about the accuracy of the calculation." Id. at 156. The Court "[did] not doubt that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol . . . will support an exigency justifying a . . . warrantless blood test," but stated that "[t]hat, however, is a reason to decide each case on its facts, as we did in Schmerber." Id. at 153. The Court refrained from speculating about all the relevant factors a court might consider in an exigent circumstances analysis, concluding that the

---

[5] However, the Court had recently reiterated that under the "so-called 'police-created exigency' doctrine," police may not "create [an] exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment." Kentucky v. King, 563 U.S. 452, 461-62 (2011).

[6] We note that even under exigent circumstances, for a warrantless search to be constitutionally sound probable cause must exist—a fact acknowledged by the state of Missouri in their argument for *per se* exigency. See McNeely, 569 U.S. at 151-52. See also Evans v. Commonwealth, 290 Va. 277, 291, 776 S.E.2d 760, 767 (2015) (holding that warrantless entry into apartment by police was justified where "both probable cause and exigent citcumstances" existed); Washington v. Commonwealth, 60 Va. App. 427, 437, 728 S.E.2d 521, 526 (2012) (noting that "[c]oupled with a showing of probable cause," certain exigencies may justify the warrantless search of a home).

"relevant factors . . . , including the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence, will no doubt vary depending upon the circumstances in the case." Id. at 164.

Thus, contrary to appellant's assertion, McNeely does not necessarily require circumstances beyond natural dissipation of alcohol that "suggest[] an actual emergency." Instead, the detrimental effects of the passage of time upon the reliability of a blood test may alone be sufficient to justify a warrantless, nonconsensual blood draw. Further, "special facts," as in Schmerber, can delay the warrant-seeking process sufficiently to contribute to exigent circumstances. And such facts are present in the instant case.

Here, viewing the facts in the light most favorable to the Commonwealth, Trooper Musgrove responded to a "fairly hectic" accident scene involving multiple serious injuries. He did not initially suspect alcohol may have played a role in the accident, and spoke only briefly with appellant before allowing her and her husband to proceed to the hospital. Musgrove subsequently learned from a witness that appellant said she had been drinking and tried to prevent police from responding to the scene. He also learned from that witness, and from his own investigation, that appellant tried to impede the accident investigation by concealing potentially relevant evidence. But Musgrove, the lead investigator of the accident scene, could not immediately proceed to the hospital to seek a breath or blood sample from appellant. Instead, his on-site duties and the approximately half-hour drive to the hospital delayed him until the three-hour implied consent window had closed.

At the hospital, appellant stated she drank "a lot more than normal" the night before, but assured Musgrove her last drink occurred 11 or 12 hours before the accident. Musgrove gave her "the benefit of the doubt" that her account was truthful, but did administer a breath test that returned a result of .130 BAC. A second breath test, administered less than 10 minutes later,

returned a lower result of .109 BAC. Conducting his investigation outside the implied consent window, and confronted with a dissipating blood alcohol content which, according to appellant, reflected alcohol consumed some 14 or 15 hours before the breath tests, Musgrove obtained a warrantless blood draw from appellant.

Considering the totality of these circumstances as they reasonably appeared to Trooper Musgrove, we conclude exigent circumstances existed to justify the nonconsensual, warrantless blood draw from appellant. Unlike in McNeely, but as in Schmerber, appellant's blood draw arose not from a "routine DWI" traffic stop but from a serious automobile accident with attendant complications. McNeely, 569 U.S. at 164 (quoting State v. McNeely, 358 S.W.3d at 74). Like the officer in Schmerber, Trooper Musgrove was delayed in pursuing the usual procedures for obtaining a valid blood draw by the need to investigate the accident. Further, his development of suspicion that alcohol played a role in the accident may itself have been delayed by appellant's act of concealing beer cans. Based on what Musgrove learned from appellant at the hospital, the alcohol she ingested may have been imbibed so remotely in time from the accident that any further delay in obtaining a blood sample would have affected the accuracy, and thus the probative value, of blood alcohol test results. Given the potential for the destruction of evidence through dissipation, and the other "special facts" specific to this situation, Trooper Musgrove acted reasonably under the circumstances to obtain evidence from appellant. We hold the trial court did not err in finding that exigent circumstances justified the warrantless blood draw from appellant.

Appellant argues the trial court erred in excluding the ACM data,[7] which would have allowed her to argue her conduct was not gross, wanton, and reckless.[8] Assuming, without deciding, that the trial court erred when it excluded the ACM data, we conclude any such error was harmless.

An appellate court "will not reverse a trial court for evidentiary errors that were harmless to the ultimate result." Carter v. Commonwealth, 293 Va. 537, 544, 800 S.E.2d 498, 502 (2017) (quoting Shifflett v. Commonwealth, 289 Va. 10, 12, 766 S.E.2d 906, 908 (2015)). "In Virginia, non-constitutional error is harmless 'when it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" Campos v. Commonwealth, 67 Va. App. 690, 717, 800 S.E.2d 174, 187-88 (2017) (quoting Lavinder v. Commonwealth, 12 Va. App. 1003, 1005-06, 407 S.E.2d 910, 911 (1991) (*en banc*)). "In a criminal case, it is implicit that, in order to determine whether there has been 'a

---

[7] We note that appellant's assignment of error alleges the trial court erred "by refusing to allow the appellant to introduce . . . expert testimony and evidence at trial involving crash retrieval data." Appellant filed a pre-trial motion requesting that the court appoint a crash data retrieval expert to assist with her defense. At the hearing on that motion, the court took the matter under advisement, granted a continuance, and invited appellant to schedule a further hearing on the matter. Appellant did not subsequently seek to obtain an expert through the court, and did not attempt to qualify an expert at trial. On brief, appellant argues only that the trial court should have allowed the ACM data into evidence. Thus, we confine our inquiry to whether the trial court erred in excluding the ACM data.

[8] While appellant's brief asserts that the ACM data "would have allowed [her] to argue against[] gross, wanton and reckless conduct or against evidence of intoxication," at the motion hearing, appellant argued solely that the ACM data would have allowed her to argue against gross, wanton, and culpable conduct showing a reckless disregard for human life. "The Court of Appeals will not consider an argument on appeal which was not presented to the trial court." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998). See Rule 5A:18. Thus, appellant cannot now advance the argument that admission of the ACM data would have aided her defense against charges arising from intoxication. Accordingly, we confine our inquiry to whether the trial court erred in excluding the ACM data in the context of appellant's indictment for aggravated involuntary manslaughter.

fair trial on the merits' and whether 'substantial justice has been reached,' a reviewing court must decide whether the alleged error substantially influenced the jury." Clay v. Commonwealth, 262 Va. 253, 259, 546 S.E.2d 728, 731 (2001) (quoting Code § 8.01-678). "An error does not affect a verdict if a reviewing court can conclude, without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same." Campos, 67 Va. App. at 717, 800 S.E.2d at 188 (quoting Lavinder, 12 Va. App. at 1006, 407 S.E.2d at 911).

Appellant was indicted for aggravated involuntary manslaughter as a result of driving under the influence, conviction for which requires proof of "conduct . . . so gross, wanton and culpable as to show a reckless disregard for human life." Code § 18.2-36.1(B). But the jury found no such aggravating conduct, and convicted appellant of the lesser offense of statutory involuntary manslaughter. See Code § 18.2-36.1(A). Thus, the exclusion of ACM data, evidence appellant maintains would have bolstered her defense that she did not engage in gross, wanton, and culpable conduct and was merely inattentive, could not have substantially influenced the jury and did not affect the ultimate result. Because we conclude that, had the ACM data not been excluded, the verdict on the charge of aggravated involuntary manslaughter would have been the same, we can also conclude that any error in excluding the evidence was harmless.

### C. Motion to Strike

Appellant argues the trial court erred in refusing to strike the evidence, as the Commonwealth failed to prove she was intoxicated at the time of the accident. We conclude that appellant waived this argument.

The record citation in appellant's assignment of error makes clear she appeals only the denial of her motion to strike made at the conclusion of the Commonwealth's evidence.

Appellant's argument on brief supports this conclusion, as she argues solely that the evidence of intoxication is insufficient as a matter of law to sustain her convictions.[9] Our case law makes clear that "[w]here a defendant presents evidence, he waives any motion to strike made at the close of the Commonwealth's evidence." Taylor v. Commonwealth, 58 Va. App. 185, 189, 708 S.E.2d 241, 242 (2011). See also Hutton v. Commonwealth, 66 Va. App. 714, 718 n.2, 791 S.E.2d 750, 752 n.2 (2016) (noting that although appellant assigned error to the trial court's denial of his motion to strike made at the conclusion of the Commonwealth's evidence, appellant waived that assignment of error by introducing evidence in his own behalf); Murillo-Rodriguez v. Commonwealth, 279 Va. 64, 74, 688 S.E.2d 199, 204-05 (2010) ("[A]fter the denial of a motion to strike the Commonwealth's evidence, . . . by putting on additional evidence, the defendant waives his ability to challenge the sufficiency of the Commonwealth's evidence in isolation.").

Appellant's articulation of her assignment of error and her argument on brief make clear that here, she appeals only the denial of her motion to strike made at the close of the Commonwealth's case in chief. Because appellant waived any objection to that denial when she presented her own evidence, we will not consider this issue on appeal.

## III. CONCLUSION

For the foregoing reasons, we affirm appellant's convictions.

Affirmed.

---

[9] We also note that when renewing her motion to strike, appellant failed to argue that the totality of the evidence was insufficient to prove intoxication.