# COURT OF APPEALS OF VIRGINIA

## Record No. 1912-24-1

EDDIE EUGENE ROBINSON

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Beales, Malveaux and Frucci

Argued at Norfolk, Virginia

Opinion Issued April 7, 2026

## FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Jamilah D. LeCruise, Judge[1]

J. Barry McCracken, Assistant Public Defender, for appellant.

Israel-David J.J. Healy, Assistant Attorney General (Jason S. Miyares,[2] Attorney General, on brief), for appellee.

## PUBLISHED OPINION BY
## <u>JUDGE RANDOLPH A. BEALES</u>

Eddie Eugene Robinson entered conditional guilty pleas to three felony charges of statutory burglary in violation of Code § 18.2-91, one felony charge of larceny of lottery tickets in violation of Code § 58.1-4018.1(A), one charge of grand larceny in violation of Code § 18.2-95(ii), and one charge of being a nonviolent felon in possession of a firearm in violation of Code § 18.2-308.2(A). On appeal, Robinson contends that the circuit court erred in denying his motion to suppress evidence from automatic license plate reader cameras made by Flock

---

[1] Judge David W. Lannetti denied Robinson's motion to suppress, which is the issue before the Court in this appeal.

[2] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

Safety ("Flock cameras"), arguing that the evidence was obtained in violation of the Fourth Amendment.

## I. BACKGROUND[3]

In 2023, the City of Norfolk installed a system of 172 cameras at intersections on public roadways throughout Norfolk. They capture still images of cars and their license plates and store the information—the license plate number, the color, manufacturer, and model of the car, as well as any identifying characteristics such as roof racks or bumper stickers—on servers for 30 days. Norfolk Police detectives have access to the database, and they can use it to search for particular vehicles in particular places. Police can narrow their search of the Flock database by location or timeframe but generally cannot track a vehicle in real time.

Over the course of three weeks in November 2023, several commercial storefronts in Norfolk were broken into and a number of items stolen, all in the early hours of the morning. The first of these occurred on November 5, 2023, at around 3:50 a.m., when someone broke into Nu Beauty Supply. The owner reported that money and merchandise had been stolen. Surveillance footage of the burglary showed that the perpetrator was wearing a hoodie, a head covering, a medical mask, and duck boots.

On November 12, 2023, at around 3:00 a.m., someone broke into George's Seafood. The owner reported that money and an iPad had been stolen. Surveillance footage of the burglary showed that the perpetrator was wearing a hoodie, a backpack, a face mask, and duck boots.

On November 29, 2023, at around 4:00 a.m., someone broke into Quick Serve. The owner reported that money and lottery tickets had been stolen. Surveillance footage of the burglary showed a black male wearing a hoodie, a backpack, and duck boots.

---

[3] "In reviewing the denial of a motion to suppress, we 'consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial.'" *Aponte v. Commonwealth*, 68 Va. App. 146, 156 (2017) (quoting *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017)).

Adam Hankins, an investigator at Virginia Lottery, entered the numbers of the stolen lottery tickets into a database that alerts investigators if someone attempts to cash them in. At 9:15 a.m. on November 29, 2023, the same day that Quick Serve was broken into, the database notified Investigator Hankins that someone had attempted to cash in one of the stolen tickets at Miller's Store, a gas station in Norfolk. Investigator Hankins accessed the surveillance footage from Miller's and, believing the person depicted at Miller's to match the description of the person who broke into Quick Serve, shared still photographs from the footage with the Norfolk Police Department. One of the photographs showed a white BMW SUV with black rims but did not show the car's license plate.

Knowing that there were two Flock cameras near Miller's, Norfolk Police Detective Kevin Gross entered the make and model of the vehicle into the Flock system, limiting his search to the two hours surrounding the burglary. The Flock system returned one image of a white BMW with black rims, and its license plate.[4] Detective Gross then looked up the license plate number in a Virginia Department of Motor Vehicles database, which revealed Robinson as the car's registered owner. The DMV search also yielded a photo of Robinson, whom Detective Gross determined to be the same person depicted in the footage of the burglary at Quick Serve.

Detective Gross obtained an arrest warrant for Robinson, and Robinson was arrested on December 4, 2023. Detective Gross also obtained a search warrant for Robinson's home, in which officers found lottery tickets stolen from Quick Serve, checks made out to George's Seafood, and beauty products sold by Nu Beauty Supply. Officers also found a firearm in

---

[4] Detective Gross could not recall how many white BMW SUVs the Flock system returned but was able to identify Robinson's vehicle because of its "distinctive black rims." He testified, "Not many pictures that I [had] seen while looking at that data had black rims."

Robinson's home. Robinson was charged with felony burglary, grand larceny, and larceny of lottery tickets.[5]

Robinson moved to suppress, arguing that the warrantless search of the Flock database violated the Fourth Amendment and that the evidence obtained as a result of the Flock search—the stolen property and weapon found in his home—should be suppressed. After a hearing, the circuit court denied Robinson's motion to suppress.

Robinson entered conditional guilty pleas to three felony charges of statutory burglary, one felony charge of larceny of lottery tickets, one charge of grand larceny, and one charge of being a nonviolent felon in possession of a firearm. Robinson now appeals to this Court.

## II. ANALYSIS

Robinson argues,

> The trial court erred in denying the Appellant's motion to suppress the warrantless obtaining of location and movement data of the Appellant's vehicle by police from the collection and storage of license plate and location information by means of the Flock System which constituted a search within the meaning of the Fourth Amendment requiring a warrant.

### A. Standard of Review

"The law regarding appellate review of a trial court's decision on a motion to suppress is well settled. The appellant bears the burden of establishing that reversible error occurred." *Williams v. Commonwealth*, 71 Va. App. 462, 474 (2020) (quoting *Glenn v. Commonwealth*, 275 Va. 123, 130 (2008)). "A defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact." *Jones v. Commonwealth*, 277 Va. 171,

---

[5] Robinson was indicted for several other commercial burglaries: T&T Seafood Market, Cajun Seafood, Golden City Chinese Food, Mina Seafood, and Latiendita Costa Del Mar. The Commonwealth later nolle prossed several of these charges in exchange for Robinson's conditional guilty plea. Robinson stipulated to the burglaries of Nu Beauty Supply, George's Seafood, and Quick Serve.

177 (2009) (quoting *McCain v. Commonwealth*, 275 Va. 546, 551-52 (2008)). "We are bound by the trial court's factual findings unless those findings are plainly wrong or unsupported by the evidence." *Whitaker v. Commonwealth*, 279 Va. 268, 273-74 (2010) (quoting *Whitehead v. Commonwealth*, 278 Va. 300, 306-07 (2009)). This "Court reviews *de novo* the overarching question of whether a search or seizure violated the Fourth Amendment." *Williams*, 71 Va. App. at 475 (citing *Glenn*, 275 Va. at 130). "Whether a particular governmental intrusion is reasonable within the meaning of the Fourth Amendment depends upon the particular facts and circumstances of the case." *Bennett v. Commonwealth*, 212 Va. 863, 865 (1972) (citing *Cabbler v. Commonwealth*, 212 Va. 520, 522 (1971)).

### B.  The Flock System and the Fourth Amendment

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV.  The "basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967). Therefore, a search without a warrant is "presumptively unreasonable." *Bryant v. Commonwealth*, 72 Va. App. 179, 187-88 (2020) (quoting *Glenn*, 275 Va. at 130).

"Since *Katz v. United States*, the touchstone of [Fourth] Amendment analysis has been the question whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *Rideout v. Commonwealth*, 62 Va. App. 779, 786 (2014) (alteration in original) (citation omitted) (quoting *Oliver v. United States*, 466 U.S. 170, 177 (1984)).  In other words, a search violates the Fourth Amendment if it invades a person's reasonable expectation of privacy.

New technology often "does not fit neatly under existing precedents." *Carpenter v. United States*, 585 U.S. 296, 306 (2018). "[A]s technology continues to enhance the

'Government's ability to encroach upon areas normally guarded from inquisitive eyes,' courts must assure that individuals maintain the 'degree of privacy against government that existed when the Fourth Amendment was adopted.'" *United States v. Martin*, 753 F. Supp. 3d 454, 462 (E.D. Va. 2024) (quoting *Carpenter*, 585 U.S. at 305). *See also Kyllo v. United States*, 533 U.S. 27, 34 (2001).

In *Knotts*, police installed a beeper in a container of chloroform that allowed them to track the container's location as it was driven on public highways. *United States v. Knotts*, 460 U.S. 276, 278-79 (1983). The United States Supreme Court held that the warrantless use of the beeper was constitutional because "[n]othing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case." *Id.* at 282 (citing *United States v. Lee*, 274 U.S. 559, 563 (1927)).

In *Carpenter*, the United States Supreme Court held that accessing a person's cell-site location information ("CSLI") required a search warrant because CSLI "provides an all-encompassing record of the holder's whereabouts." 585 U.S. at 311. In that case, the CSLI captured 127 days of Carpenter's movements, with an average of 101 data points per day. *Id.* at 302. The United States Supreme Court stated that CSLI "provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations'" because "[a] cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* at 310-11 (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012)). "Accordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* at 311-12. The Court held that using CSLI to create and

maintain a comprehensive chronicle of a person's movements for a period of over 100 days invaded that person's reasonable expectation of privacy. *Id.* at 311, 313. Thus, the Supreme Court held, accessing the data was a search within the meaning of the Fourth Amendment and required a search warrant. *Id.* at 316.

Finally, in *Leaders of a Beautiful Struggle*, the United States Court of Appeals for the Fourth Circuit, sitting en banc, held that an aerial surveillance program that tracked the movements of people and vehicles in Baltimore violated the Fourth Amendment because its extensive tracking of city residents revealed "intimate details through habits and patterns." *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330, 341 (4th Cir. 2021) (en banc). The cameras were operated from the air twelve hours a day—only during daylight— and covered ninety percent of the city. *Id.* at 334. The data was retained for 45 days. *Id.* The court applied *Carpenter* in holding that a search warrant was required to access the system. *Id.* at 341-42.

These precedents guide our review. As our Supreme Court has instructed, "Whether a particular governmental intrusion is reasonable within the meaning of the Fourth Amendment depends upon the particular facts and circumstances of the case." *Bennett*, 212 Va. at 865 (citing *Cabbler*, 212 Va. at 522). We find that the use of the Flock system in this case is similar to *Knotts*, but significantly factually distinguishable from both *Carpenter* and *Leaders of a Beautiful Struggle*.

As a threshold matter, Robinson had no reasonable expectation of privacy in the physical characteristics of his vehicle as he drove it down a public street. In the case now before us, as in *Knotts*, the use of the Flock cameras did not constitute a search because "the movements of the vehicle . . . had been 'voluntarily conveyed to anyone who wanted to look.'" *Carpenter*, 585 U.S. at 306 (quoting *Knotts*, 460 U.S. at 281). Indeed, as this Court has recently stated, "A

person driving his vehicle on a public street with his license plate in plain view has no reasonable expectation of privacy that his vehicle and license plate will not be seen by other persons, including law enforcement officers." *Commonwealth v. Church*, No. 0737-25-1, slip op. at 4, 2025 Va. App. LEXIS 627, at \*5 (Oct. 14, 2025) (citing *Knotts*, 460 U.S. at 281).

Moreover, it simply cannot be said that the City of Norfolk's system of Flock cameras amounted to "near perfect surveillance." *Carpenter*, 585 U.S. at 312. The 172 Flock cameras situated throughout Norfolk are not as intrusive as the cell towers in *Carpenter* that monitor the movement of cell phones both inside and outside of homes and buildings—or the surveillance of a city from the air in *Leaders of a Beautiful Struggle*. The images captured by the Flock cameras are of vehicles, not persons, and the only pieces of information collected—license plates and physical characteristics of the vehicle—are already publicly viewable to anyone who sees the vehicle on the street. The search of the Flock system yielded a photo of Robinson's car as it passed down a public highway. The cameras did not continuously monitor all of his travels around the city and did not create an "intimate window" of Robinson's overall movements and associations. *See, e.g.*, *Schmidt v. City of Norfolk*, ___ F. Supp. 3d ___, ___ (E.D. Va. 2026) (noting that the Flock cameras appear intermittently "across the many miles of Norfolk roadways such that they are incapable of cataloging the whole of vehicles' movements"). Unlike in *Carpenter* and *Leaders of a Beautiful Struggle*, the Flock system takes only still images of a vehicle's exterior as it passes down public thoroughfares—not of the person. It is not "a detailed chronicle of a person's physical presence compiled every day, every moment, over several years." *Carpenter*, 585 U.S. at 315.

Thus, Detective Gross did not have to obtain a search warrant to access the Flock system because he was merely requesting information that showed still images of a vehicle in which Robinson did not have a reasonable expectation of privacy. In addition, the Flock cameras did

not augment police officers' sensory faculties to an impermissible degree. The cameras interspersed along public roads throughout the City of Norfolk are hardly analogous to the 127 days of cell-site location information at issue in *Carpenter*, and the images are only stored on servers for 30 days. The scope and scale of the information captured by the Flock cameras are also not analogous to the aerial surveillance of every movement of virtually every resident of Baltimore for twelve hours a day that the Fourth Circuit considered in *Leaders of a Beautiful Struggle*. For all of these reasons, we therefore hold that the use of the Flock system in this case did not constitute a search that violated the Fourth Amendment.

We are also persuaded by recent federal cases that have already addressed the Flock systems in Richmond and Norfolk. *See United States v. Martin*, 753 F. Supp. 3d 454 (E.D. Va. 2024) (Richmond); *Schmidt*, ___ F. Supp. 3d at ___ (Norfolk). While not binding on this Court, we find these federal district court decisions instructive as they concern the same system of cameras as in the case now before this Court. In *Martin*, the United States District Court for the Eastern District of Virginia held that police officers in Richmond and Chesterfield County did not violate any reasonable expectation of privacy by using information obtained from the Flock system in their investigation of the defendant, Martin. 753 F. Supp. 3d at 476. In that case, out of 2,500 photographs taken of vehicles in a 30-day period, only three were of the defendant's vehicle. *Id.* at 472. In *Schmidt*, the court held that the City of Norfolk's system of Flock cameras—the very same system at issue in the case now before this Court—did not violate the plaintiffs' Fourth Amendment rights and awarded summary judgment to the City of Norfolk.[6] ___ F. Supp. 3d at ___. Both *Martin* and *Schmidt* distinguished *Carpenter* and *Leaders of a*

---

[6] In *Schmidt*, the plaintiffs brought suit under 42 U.S.C. § 1983 and the Declaratory Judgment Act.

*Beautiful Struggle*, finding that those cases involved much more invasive searches. *Martin*, 753 F. Supp. 3d at 471-73; *Schmidt*, ___ F. Supp. 3d at ___.

The Virginia Supreme Court has stated that an assessment of whether a new technology runs afoul of the Fourth Amendment is a fact-based inquiry. *See Bennett*, 212 Va. at 865. *See also Martin*, 753 F. Supp. 3d at 476 ("This Court must rule on the facts as they are and may not speculate about what the future may hold for Flock's capabilities."). We must decide each case on its facts and therefore our decision is based on the current system of Flock cameras in the City of Norfolk. We decline to speculate as to when—or if—the Flock cameras could create such "a comprehensive chronicle" of a person's movements where that person would then have a reasonable expectation of privacy. *Carpenter*, 585 U.S. at 300. The search of the Flock database in this case was not an unreasonable search in violation of the Fourth Amendment.

### III.  CONCLUSION

In short, because the Flock system simply took pictures of the license plate of Robinson's vehicle and the exterior of his vehicle as he drove it down public thoroughfares in the City of Norfolk, the police were not required under the Fourth Amendment to obtain a search warrant in order to access the Flock system. Consequently, for all of the foregoing reasons, we affirm the judgment of the circuit court.

*Affirmed.*