COURT OF APPEALS OF VIRGINIA

Present:   Judges Russell, Athey and Senior Judge Frank
Argued at Hampton, Virginia


DELANO GRANGRUTH

                                                MEMORANDUM OPINION* BY
v.        Record No. 0401-21-1          JUDGE WESLEY G. RUSSELL, JR.
                                                APRIL 5, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Jerrauld C. Jones, Judge

J. Barry McCracken, Assistant Public Defender, for appellant.

Lauren C. Campbell, Assistant Attorney General (Mark R. Herring,[1]
Attorney General, on brief), for appellee.


Delano Grangruth was convicted of first-degree murder, arson of an occupied dwelling, and

arson of personal property. He assigns error to the trial court's denial of his motion to suppress the

evidence underlying his convictions. He specifically argues that the police detained him without

probable cause and that the police and fire marshals unlawfully entered and searched his premises

without consent or a warrant. He further argues that a subsequently obtained search warrant was

based on an affidavit lacking sufficient indicia of probable cause and that the officers could not have

acted reasonably and in good faith in assuming the warrant was valid. For the following reasons,

we disagree with appellant and affirm the judgment of the trial court.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

BACKGROUND

"On appeal, we state the facts 'in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences.'" *Commonwealth v. White*, 293 Va. 411, 413 (2017) (quoting *Evans v. Commonwealth*, 290 Va. 277, 280 (2015)). "When considering whether to affirm the denial of a pretrial suppression motion, an appellate court reviews not only the evidence presented at the pretrial hearing but also the evidence later presented at trial."[2] *Hill v. Commonwealth*, 297 Va. 804, 808 (2019) (quoting *White*, 293 Va. at 414). In conducting our review, "[w]e also presume—even in the absence of specific factual findings—that the trial court resolved all factual ambiguities or inconsistencies in the evidence in favor of the prevailing party and gave that party the benefit of all reasonably debatable inferences from the evidence." *Id.*

So viewed, the evidence established that appellant and his wife were living together and were the sole occupants of 6201 Wailes Avenue in Norfolk. Mrs. Grangruth suffered from several significant medical conditions, was not mobile, and required daily caretaking. Appellant was her primary caregiver. Amore Home Health Care also provided daily services for Mrs. Grangruth.

On April 17, 2018, Vanessa Jones, an employee of Amore, went to the Grangruth home after another Amore employee attempted a home visit earlier in the day but received no response from the Grangruths. When Jones arrived, she experienced a burning smell as soon as she stepped out of her vehicle. She called for Mrs. Grangruth and knocked on the door. When she saw soot on the door of the house, she called her office, which in turn directed her to notify

---

[2] Although there was not a contested "trial" because Grangruth entered conditional guilty pleas, the parties entered into a written stipulation of facts that was presented to the trial court at the guilty plea hearing. Accordingly, our review considers both the evidence adduced at the suppression hearing and the facts contained in the written stipulation.

police. In statements made to both the police and fire department personnel, Jones described appellant as "irate" and "upset" during their previous telephone interactions.

Norfolk Fire and Rescue arrived at the residence at 10:17 a.m. Captain Jerle Plude and firefighter Jerome Fronefield approached the home, and, upon observing soot stain on the outside of the home, believed that an active fire was burning inside. The door was locked, so they forced entry. Plude immediately saw the remains of Mrs. Grangruth in a chair. Based on Mrs. Grangruth's extensive burn injuries, Plude concluded that Mrs. Grangruth was deceased. The firefighters walked through the house and determined there was no longer an active fire. Consistent with standard practice, the firefighters then ventilated the house to remove the contaminated air. That process took about twenty minutes, and afterward they conducted a secondary search for more occupants, finding none.

Norfolk police detectives and Norfolk fire investigators arrived shortly after the ventilation protocol was concluded to conduct "parallel" investigations for the cause and origin of the fire. Norfolk Police Lieutenant Shaun Squyres had been notified by the fire department that the remains of a deceased person were inside the residence. After consulting with individuals at the scene, Squyres learned that the victim's husband was normally at the residence every day. Concerned that the firefighters may have overlooked the husband's presence in the house, Squyres performed his own walk through once the firefighters deemed the property safe to enter.

As Squyres walked through the residence, he saw a nine-volt battery on the carpet just below the smoke detector. He also observed that the smoke detector was intact and that the battery was covered in soot, which led him to conclude that the smoke detector was disabled prior to the fire. Squyres noted that, in a fire investigation, it was unusual to find that the circuit breakers had not been "tripped" and that the air conditioning unit was running. It was also

- 3 -

brought to his attention that the home telephone, a landline, had been disconnected. Squyres did not find any other persons in the residence. Based on his observations and information received about the victim and her husband, Squyres determined this was a crime scene. Squyres consulted with his officers and dispatched detectives to prepare a search warrant. Squyres ordered a "stand down" until the search warrant was obtained.

Detective Jean Claude Noel spoke with Jones and Tiffany Porter at the scene. Jones informed him that she arrived at the residence to check on Mrs. Grangruth, but no one answered the door. She smelled fire and called 911. Porter, an office assistant with Amore, relayed that appellant should have been at the residence as he was always there and was his wife's primary caretaker. She tried to contact appellant by calling the house phone and his cellular phone that morning; he never responded, which was uncharacteristic of him. Porter advised that appellant was "mean" to her, the care workers, and to Mrs. Grangruth.

In addition to the information provided by the health care workers, Noel knew that there was a deceased body inside the house and that there had been a fire inside that location. Noel knew that the fire was contained in the living room where Mrs. Grangruth was sitting in a chair. Noel also knew that appellant could be a "very difficult" person and that he was missing. Without having entered the house, Noel sought to obtain a search warrant based on information he possessed at the time.

The affidavit Noel submitted in support of the warrant stated as follows:

> On 04/17/18 at approximately 1023 hours Norfolk Fire and Medic 10 responded to 6201 Wailes Ave on a possible fire. When entry was made a deceased body was located, who we believed to [be] a Kathleen Grangruth, with a date of birth of 06/14/1956, and a social security number of []. Medic 10 pronounced the deceased at approximately . . . 1026 hours.
>
> This applicant requests a search warrant for the residence located at 6201 Wailes Ave, in the City of Norfolk, Virginia, to include its curtilage to recover any weapons, fingerprints, DNA, trace

evidence, clothing that may contain DNA, or other trace evidence, electronic devices, identifying documents and any and all evidence of the offense of burning or destroy[ing] a dwelling.

The magistrate found probable cause and issued the warrant at 2:33 p.m. Police executed the warrant at 2:53 p.m.

While at the house, Lieutenant Mark Heckman accessed the LINX system to research the Grangruths' address. From this, Heckman became aware of a history of domestic violence at the residence. Among a number of calls for assistance at the residence, Heckman reviewed a specific report from 2013 when appellant threatened to kill Mrs. Grangruth and burn down the house. Heckman showed his officers a photograph of appellant from that report and instructed them to canvass the area and detain appellant.

At approximately 12:05 p.m., Officers Kavoris Fruster and Cheryl Wiltshire-Allen located appellant near a McDonald's restaurant several miles from his house. They approached appellant, engaged him in a brief conversation, and asked for identification, which he provided. Officers then asked appellant to empty his pockets and place his personal items, including his wallet, phone, and medications, into a bag for inventory purposes. Appellant was told he was being detained for further questions. Police patted down appellant for weapons before placing him into the police vehicle. Police transported appellant to the Police Operations Center.

Once at the operations center, officers placed appellant in handcuffs per protocol and escorted him through the building and into the interview room, where officers removed the handcuffs. Investigators advised appellant of his *Miranda* rights; he waived those rights and agreed to speak with them. During questioning, appellant asked for an attorney and the interrogation was terminated. Soon thereafter, appellant reinitiated contact with the investigators and indicated he wished to speak with them. After signing a legal rights advice form, appellant

confessed to pouring gasoline on his wife and setting her on fire. The confession was recorded and transcribed.

Prior to trial, appellant filed a motion to suppress alleging three Fourth Amendment violations: "First, that [appellant] was seized and held in custody for several hours without probable cause. Second, police officers searched his home without a warrant. Third, the search warrant for [appellant's] home was defective in that the probable cause statement to secure the warrant does not allege criminal behavior." The Commonwealth filed a response, and the trial court held a three-day hearing on the motion. The trial court entered a written order denying the motion.

The trial court concluded that "neither the warrantless search by the Norfolk Fire Department nor the warrantless search by the Norfolk Police Department violated the Constitution, and the [c]ourt will not suppress any evidence seized during those searches." The trial court reasoned,

> Here, the Norfolk Fire Department arrived at [d]efendant's house after receiving reports of a fire inside the home. To save any victims that might remain trapped inside, the Norfolk Fire Department entered the home by breaking down the locked front door. Inside the home, the firefighters observed the charred remains of [d]efendant's wife and the smoldering aftermath of the blaze that consumed her. After ventilating the home, fire officials investigated the cause and origin of the fire—an exigent circumstance that justified their warrantless intrusion into the home. . . . During their investigation, fire officials discovered incriminating evidence—like a disconnected home phone and a disabled smoke detector—in plain view.

The trial court also determined that the seizure of appellant was lawful, specifically finding that police had probable cause to detain appellant. The trial court explained,

> When the police seized [d]efendant, they knew that his disabled, immobile wife had died from injuries sustained during a fire inside their locked home. They knew that the fire almost completely consumed [d]efendant's wife, but largely did not spread to other parts of [the] home—allowing experienced fire and police officials

- 6 -

to surmise that the fire started near [d]efendant's wife. Additionally, the police had received reliable information from home care aides that regularly worked with [d]efendant and his wife that [d]efendant, as his wife's primary caretaker, rarely left his wife unattended, making his absence from the home on the morning of April 17, 2018, unusual. These same home care aides informed the police of [d]efendant's frequently demeaning and hostile interactions with his wife. Indeed, before seizing [d]efendant, the police searched [his] criminal history and discovered that [he] had previously assaulted his wife and threatened to kill her and burn down the house if she called the police. Finally, police knew that someone had unplugged [the] home phone and disabled the home's smoke alarms.

The trial court also found that the search warrant obtained by Noel was not defective because the affidavit attested to Noel's credibility and that the magistrate had a "substantial basis for determining that the Norfolk police had a fair probability of finding contraband or evidence of arson in [appellant's] home because the affidavit reported a burned home, which can result from only two things—an accident or arson." In the alternative, the trial court reasoned that even if the magistrate lacked probable cause to issue the warrant, evidence seized pursuant to the warrant is nevertheless admissible because Noel had an objectively reasonable belief that the magistrate had probable cause to issue the warrant.

His motion to suppress having been denied, appellant elected to enter conditional guilty pleas to the three felony charges he faced.[3] This appeal followed with appellant arguing that the trial court erred in denying his motion to suppress on multiple grounds. First, he contends that

---

[3] Code § 19.2-254 provides, in part, that,

> [w]ith the approval of the court and the consent of the Commonwealth, a defendant may enter a conditional plea of guilty in a misdemeanor or felony case in circuit court, reserving the right, on appeal from the judgment, to a review of the adverse determination of any specified pretrial motion.

Appellant's conditional guilty pleas specifically reserved his right "to [seek] a review of the litigated pretrial motion to suppress."

the trial court erred in failing to suppress his confession and any items discovered on his person when he was seized by police because his seizure was supported by neither reasonable, articulable suspicion nor probable cause during the relevant time period. Next, he argues that the trial court erred in failing to suppress any evidence discovered as a result of the entry of the police or the medical examiner into his home, contending that those entries violated his Fourth Amendment rights. He further contends that any evidence discovered as a result of the fire marshal's entry into his home should have been suppressed as violative of the Fourth Amendment. Finally, he argues that the search warrant was based on an affidavit lacking sufficient indicia of probable cause and that the officers could not have acted reasonably and in good faith in assuming the warrant was valid.

ANALYSIS

I. Standard of review

"Absent clear evidence to the contrary in the record, the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied to the facts." *Barkley v. Commonwealth*, 39 Va. App. 682, 690 (2003) (quoting *Yarborough v. Commonwealth*, 217 Va. 971, 978 (1977)). Thus, an appellant "challenging the trial court's denial of his motion to suppress . . . 'bears the burden of establishing that reversible error occurred.'" *Saal v. Commonwealth*, 72 Va. App. 413, 421 (2020) (quoting *Mason v. Commonwealth*, 291 Va. 362, 367 (2016)). A "claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact . . . ." *Merid v. Commonwealth*, 72 Va. App. 104, 108-09 (2020) (quoting *King v. Commonwealth*, 49 Va. App. 717, 721 (2007)), *aff'd*, 300 Va. 77 (2021). Accordingly, we are "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them." *Knight v. Commonwealth*, 61 Va. App. 297, 305 (2012) (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (*en banc*)). In addition, we

- 8 -

"give 'due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" *Kyer v. Commonwealth*, 45 Va. App. 473, 479 (2005) (*en banc*) (quoting *Slayton v. Commonwealth*, 41 Va. App. 101, 105 (2003)). Nevertheless, we "review[] *de novo* the overarching question of whether a search or seizure violated the Fourth Amendment." *Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021) (quoting *Williams v. Commonwealth*, 71 Va. App. 462, 475 (2020)).

## II. The Fourth Amendment

The Fourth Amendment to the United States Constitution provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Thus, the Fourth Amendment protects people, their houses, and their things from both unreasonable searches and unreasonable seizures. As the United States Supreme Court has observed,

> [a] search may be of a person, a thing, or a place. So too a seizure may be of a person, a thing, or even a place. A search or a seizure may occur singly or in combination, and in differing sequence. In some cases the validity of one determines the validity of the other.

*Bailey v. United States*, 568 U.S. 186, 189 (2012). Resolution of the issues before us requires review of the seizure of appellant and the search of his home.

## III. Seizure of appellant

The trial court found that police had "probable cause to detain" appellant, and therefore, declined to "suppress [appellant's] confession . . . or other evidence seized because of his detention." Appellant contends that this was error, arguing that any evidence discovered as a result of his seizure and the confession he made while he was seized should have been suppressed because his initial seizure was "not predicated on a reasonable and articulable suspicion of illegal activity which rapidly morphed into an illegal arrest not predicated on probable cause."

Generally speaking, "[i]nteractions between the police and citizens fall into one of three categories: (1) consensual encounters, (2) investigatory, or *Terry*,[4] stops requiring reasonable suspicion, and (3) full arrests requiring probable cause." *McLellan v. Commonwealth*, 37 Va. App. 144, 150-51 (2001). These categories are not static: what begins as a consensual encounter can progress to a *Terry* stop and culminate with a full arrest.

Here, appellant argues that what may have started as a *Terry* stop requiring reasonable, articulable suspicion quickly progressed to a full arrest requiring probable cause. The Commonwealth contends that the encounter began as a consensual one and that any escalation was supported by sufficient reasonable, articulable suspicion or probable cause at the pertinent times. We need not determine when the encounter went from consensual to a *Terry* stop to a full arrest because, ultimately, we conclude that the trial court correctly determined that officers possessed probable cause prior to their seizure of appellant.

Although appellant contests the trial court's conclusion that the officers possessed probable cause, he does not "dispute[] that the Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). Probable cause, "as the very name implies, deals with probabilities." *Derr v. Commonwealth*, 242 Va. 413, 421 (1991) (quoting *Saunders v. Commonwealth*, 218 Va. 294, 300 (1977)). Although probable cause is a higher standard than reasonable suspicion, it "requires only a probability or substantial chance of criminal activity, *not an actual showing of such activity*." *Joyce v. Commonwealth*, 56 Va. App. 646, 659 (2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). It "does not 'demand any showing that such a belief be . . . more likely true than false.'" *Slayton*, 41 Va. App. at 106 (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion)). "Not

---

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

even a '*prima facie* showing' of criminality is required" to establish probable cause. *Joyce*, 56 Va. App. at 659 (quoting *Gates*, 462 U.S. at 235). Ultimately, "'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *DeFillippo*, 443 U.S. at 37.

In determining whether officers have probable cause to arrest, "we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). This requires us to view the totality of the circumstances. *Jones v. Commonwealth*, 279 Va. 52, 59 (2010). As noted above, in conducting our review, we "give 'due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" *Kyer*, 45 Va. App. at 479 (quoting *Slayton*, 41 Va. App. at 105).

Here, the trial court found that police were aware of several salient facts when they seized appellant. The police knew that appellant lived with his wife, that his wife was disabled and immobile, and that appellant was "his wife's primary caretaker [and] rarely left his wife unattended[.]" [5] The trial court further found that the police knew that appellant's "wife had died from injuries sustained during a fire inside their locked home[,]" that the fire had "almost completely consumed [appellant's] wife, but largely did not spread to other parts of [the]

---

[5] Appellant argues that other evidence in the record established that he often rode his bicycle to McDonald's for breakfast, and therefore left his wife at home alone. He notes that police located him precisely because they followed up on the suggestion that he might be at McDonald's and found him there. This fact, however, creates, at most, a conflict in the evidence. Because there is evidence in the record to support the trial court's conclusion that he rarely left his wife unattended, we must defer to that finding. *Knight*, 61 Va. App. at 305.

home[,]" and that, prior to the fire, the home's smoke detectors had been "disabled[.]"  The police also had learned that appellant was "frequently demeaning and hostile [in his] interactions with his wife" and that he "previously [had] assaulted his wife and threatened to kill her and burn down the house."  Although appellant disputes some of these findings of fact, the record is sufficient to support a requisite level of certainty as to each of these findings.  Accordingly, we are bound by them in conducting our review.  *Knight*, 61 Va. App. at 305.

Taken together, these facts provide more than sufficient probable cause to support the seizure of appellant.  Reasonable police officers could (and did) view the totality of these circumstances and conclude both that it was likely that Mrs. Grangruth had been killed in an intentionally set fire and that appellant was the person who set that fire.  Even appellant conceded at oral argument in this Court that these facts, taken together, "may" have been sufficient to support probable cause.[6]  In short, although the facts the trial court found were known to the police at the time of appellant's seizure may have been insufficient to establish his guilt beyond a reasonable doubt, they were sufficient to establish probable cause to believe he had engaged in criminal activity.[7]

---

[6] In conceding only that there "may" have been probable cause, appellant noted that there may have been no crime at all and stressed that fires are presumed accidental unless evidence indicates otherwise. *See Poulos v. Commonwealth*, 174 Va. 495, 500 (1940).  This presumption, however, does not serve to negate a finding of probable cause to believe that any particular fire was the result of criminal wrongdoing.  In the probable cause context, the presumption is nothing more than a recognition that there may be an innocent explanation for the fire.  Such a potential innocent explanation does not negate probable cause. *See, e.g.*, *Gates*, 462 U.S. at 245 n.13 (recognizing that "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity . . . therefore, *innocent behavior frequently will provide the basis for a showing of probable cause*" (emphasis added)).

[7] Appellant also argues that at least some of this information was learned in the course of what he characterizes as illegal searches by police and fire officials.  For the reasons stated below, we conclude that such searches did not offend the Fourth Amendment or require that any evidence discovered be suppressed.

Appellant argues that, even if this is so, his seizure was not supported by probable cause because the officers who seized him lacked probable cause to do so because they personally did not possess all of this information. Appellant acknowledges that the "collective knowledge doctrine" allows arresting officers to seize a suspect so long as the officer ordering the seizure possesses sufficient reasonable suspicion or probable cause to support the seizure; however, quoting the Fourth Circuit's decision in *United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011), he argues that the doctrine "'simply directs [courts] to substitute the knowledge of the instructing officer or officers for the knowledge of the acting officer; it does not permit us to aggregate bits and pieces of information from among myriad officers, nor does it apply outside the context of communicated alerts or instructions.'"

From this premise, he argues that neither Fruster nor Wiltshire-Allen, the arresting officers, nor Heckman, the instructing officer, possessed all of the information detailed by the trial court even if it were possessed by other officers.[8] The Commonwealth counters that, even if they did not expressly testify that they possessed all of the information, the record reflects conversations among officers at the scene of the fire, giving rise to a permissive inference that Fruster, Wiltshire-Allen, and Heckman knew all of the facts known to police.

We need not resolve this dispute because the record demonstrates that the combination of information clearly known to Fruster, Wiltshire-Allen, and Heckman was sufficient to support probable cause to seize appellant. At a minimum and without relying upon the inference advanced by the Commonwealth, these officers knew at the time of the seizure that:

- Appellant and Mrs. Grangruth were the only residents of the home where the fire occurred;

- Mrs. Grangruth was disabled and largely immobile;

---

[8] Appellant does not dispute that the information possessed by both the arresting and instructing officers can be aggregated.

- A female, presumably Mrs. Grangruth, had died in a fire at the home;

- The fire did not consume the entire home, but rather, was contained to a small area;

- As Mrs. Grangruth's primary caregiver, it was unusual for appellant not to be at home and not to respond to attempts to contact him;

- Appellant had a history of mistreating Mrs. Grangruth, including past complaints of domestic violence; and, perhaps most importantly,

- Related to one of the prior complaints of domestic violence, appellant had threatened to burn down the house.

Taken together, these facts were "'sufficient in themselves to warrant a man of reasonable caution [to have] the belief that' an offense ha[d] been . . . committed[,]" *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)), and that appellant had committed it. Accordingly, the seizure of appellant did not offend the Fourth Amendment, and therefore, the trial court did not err in refusing to suppress his confession or the evidence discovered on his person at the time of the seizure.

IV. Entries into and searches of the home

Appellant does not challenge the firefighters' initial entry into the home, conceding that the initial entry did not violate the Fourth Amendment. He contends, however, that subsequent warrantless entries by the police, the medical examiner, and, ultimately, the fire marshal violated the Fourth Amendment.

Quoting *Payton v. New York*, 445 U.S. 573, 585 (1980), appellant correctly notes that "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" The protections afforded the home by the Fourth Amendment's warrant requirement are not limited to intrusions by police, but also apply to other government officials, including fire officials. *See Michigan v. Clifford*, 464 U.S. 287, 291-92 (1984); *Michigan v. Tyler*, 436 U.S. 499, 504 (1978). Although warrantless entries and searches of the home, whether conducted by police or other government officials, are presumptively

unreasonable, the "presumption may be overcome in some circumstances because 'the ultimate touchstone of the Fourth Amendment is "reasonableness."'" *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

As noted above, appellant concedes that the initial entry into the home by firefighters was reasonable because the firefighters were faced with exigent circumstances, a presumptively burning building that posed a potential threat to life and property. Furthermore, it is undisputed that

> the exigent circumstances created by a fire are not extinguished the moment the fire is put out. Rather, the exigent circumstances warranting intrusion by government officials continue for a reasonable time after the fire has been extinguished to allow fire officials to fulfill their duties, including making sure the fire will not rekindle, and investigating the cause of the fire.

*Jones v. Commonwealth*, 29 Va. App. 363, 369 (1999) (citing *Tyler*, 436 U.S. at 510). Accordingly, the entry and search of the home by the firefighters who initially responded did not offend the Fourth Amendment.

That fact greatly affects our analysis of the subsequent entries by the police, the medical examiner, and the fire marshal. Obviously, a homeowner's expectation of privacy is greatly diminished when government officials, in this case firefighters, lawfully have entered the home and lawfully conducted a search. Once the firefighters lawfully entered, appellant lost any expectation of privacy that would shield from police *knowledge* of the existence of things that were in the plain view of the firefighters. *See Horton v. California*, 496 U.S. 128, 133 n.5 (1990) (noting that "[i]t is important to distinguish 'plain view' . . . to justify *seizure* of an object, from an officer's mere observation of an item left in plain view" and to recognize that "the latter

generally involves no Fourth Amendment search" (quoting *Brown*, 460 U.S. at 740 (plurality opinion))).[9]

Thus, all that the firefighters observed was no longer private, but rather, was known to the government and appellant had no reasonable expectation of privacy that prevented the government from acting on that knowledge. No warrant was required for the firefighters to pass along what they had observed to other government officials, including the police, nor was a warrant required to allow the police to stand in the same location as the firefighters given the limited time frame at issue. *Cf. Jones*, 29 Va. App. at 370-71 (dealing with the more intrusive seizure of items and recognizing that where "a lawful intrusion has already occurred, . . . the invasion of privacy is not increased by an additional officer entering the residence" and that the Fourth Amendment generally is not offended if "police officers merely followed in the footsteps of [a firefighter], who was authorized to enter the residence to fulfill his duties as a firefighter").

This is true whether or not what was observed by the firefighters was contraband or obviously was criminal in nature. Thus, without offending the Fourth Amendment, police were privy to all that the firefighters saw. Importantly, the firefighters had seen Mrs. Grangruth's charred corpse.

Regardless of whether the corpse was immediately known to be evidence of a crime or could be classified as contraband, factors that might be pertinent if government officials had seized it and removed it from the home without a warrant, *Horton*, 496 U.S. at 136-37, officers' knowledge of the corpse further diminished appellant's reasonable expectation of privacy in his home. It is not objectively reasonable to expect emergency responders encountering a charred

---

[9] The distinction between government officials *seeing* evidence and *seizing* that evidence is significant. Merely seeing objects that are visible from a lawful vantage point "does not intrude upon a legitimate expectation of privacy," and thus, "is no 'search' subject to the Warrant Clause." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).

corpse in a private home to simply shrug their shoulders and ignore it; the reasonable thing to do is to immediately investigate the corpse further, and the Fourth Amendment was not violated when the police, the medical examiner, and the fire marshal did so.

This is not to say that a firefighter's lawful presence in a premises destroys all expectations of privacy. Quite the contrary. *See Clifford*, 464 U.S. at 291-92; *Tyler*, 436 U.S. at 504. Rather, it is our recognition that all of the facts and circumstances present here rendered reasonable the actions of the government officials prior to the warrant being secured.

In evaluating the reasonableness of the government officials' actions, we consider "[t]he number of prior entries, the scope of the search, the time of day when it is proposed to be made, the lapse of time since the fire, the continued use of the building, and the owner's efforts to secure it against intruders . . . ." *Tyler*, 436 U.S. at 507. Here, the scope of the pre-warrant searches by the police, the medical examiner, and, ultimately the fire marshal, were largely limited to areas over which the initial firefighters already had trod and were largely confined to things that were already exposed to having been seen. Little time had elapsed between the firefighters' initial entry to deal with the suspected fire and the subsequent entry by other government officials with less than five hours separating the initial entry and the execution of a search warrant. Furthermore, there was no time during that period when government officials were not present on the premises.[10] Finally, at no point during that time was there any attempt by appellant to assert control over the premises or to secure it from view.[11]

---

[10] This distinguishes the activity here from the searches found suspect in *Tyler*, which occurred after all officials had left the premises and returned days or even weeks later. 436 U.S. at 511; *see also Clifford*, 464 U.S. at 293 (recognizing that "investigations begun *after . . . fire and police officials have left the scene*, generally must be made pursuant to a warrant or the identification of some new exigency" (emphasis added)).

[11] We recognize that two circumstances likely affected appellant's ability to take such steps. First, very little time passed from the initial entry that even appellant concedes was proper

Considering all of the facts and circumstances, we conclude that the entries of the police, the medical examiner, and the fire marshal onto the premises were not unreasonable within the meaning of the Fourth Amendment. Accordingly, the trial court did not err in denying appellant's motion to suppress related to the pre-warrant activities of the identified government officials.

## V. Search warrant

Asserting multiple reasons, appellant challenges the refusal of the trial court to suppress any evidence seized or discovered as a result of the search warrant obtained by Noel. He contends that "the search warrant was so lacking in indicia of probable cause that the magistrate's reliance thereon rendered the issuance of the warrant unreasonable[,]" that the search "warrant was also a general warrant and therefore overbroad[,]" and that "[t]he 'good faith exception' . . . does not apply[.]"

The Commonwealth counters that the trial court correctly found that the magistrate properly issued the warrant because it was supported by probable cause and that, in any event, the good faith exception would apply to prevent the suppression of the pertinent evidence. Alternatively, the Commonwealth argues that the doctrine of inevitable discovery would preclude suppression of the evidence. The Commonwealth reasons that officers already had seen much of the evidence lawfully and that it is inevitable that a house in which a fire burned someone to death will be searched as part of either a criminal or fire investigation. Finally, the Commonwealth, citing multiple decisions of the United States Supreme Court and the Virginia Supreme Court, contends that, given the totality of the circumstances here, the officers' conduct was not sufficiently egregious to "warrant[] the harsh repercussions of the exclusionary rule."

---

until the search warrant was obtained. Second, appellant was in police custody for a significant portion of that time. Although the latter augurs in appellant's favor, the former does not.

Although the parties advance multiple arguments and counterarguments, "[t]he doctrine of judicial restraint dictates that we decide cases on the best and narrowest grounds available." *Commonwealth v. Swann*, 290 Va. 194, 196 (2015) (internal quotation marks and citations omitted). Because we conclude that, even if we were to assume that the magistrate lacked a substantial basis to issue the search warrant, the good faith exception allowed officers to rely on the warrant to search the premises, we limit our analysis to the trial court's ruling regarding good faith.[12]

Although the Fourth Amendment requires that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized[,]" the United States Supreme Court has long recognized that "[w]hether the exclusionary sanction is appropriately imposed . . . is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" *United States v. Leon*, 468 U.S. 897, 906 (1984) (quoting *Gates*, 462 U.S. at 223). The United States Supreme Court has recognized multiple circumstances in which a violation of the Fourth Amendment does not lead to the suppression of the evidence obtained. One such circumstance is the good faith exception, where "evidence [is] obtained in objectively reasonable reliance on a subsequently invalidated search warrant[.]" *Id*. at 922.

In most cases, an officer's good faith is established by the fact he or she is acting in accordance with a search warrant issued by a detached and neutral magistrate. *See United States v. Ross*, 456 U.S. 798, 823 n.32 (1982) ("Although an officer may establish that he acted in good

---

[12] Accordingly, we do not address appellant's arguments that the warrant was improperly issued or that it was overbroad. Similarly, we do not address the Commonwealth's arguments that the evidence inevitably would have been discovered or that the officers' conduct was such that the exclusionary rule still would not apply even if the good faith exception did not.

faith in conducting the search by other evidence, a warrant issued by a magistrate normally suffices to establish it."). Exceptions to this general rule include when the search warrant affidavit contains statements the officer knows are false or that represent a reckless disregard for the truth, *Franks v. Delaware*, 438 U.S. 154, 156 (1978); when the magistrate has acted with disregard for his role as a neutral and detached judicial officer, *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326-27 (1979); when the warrant "affidavit [is] 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" *Leon*, 468 U.S. at 923 (quoting *Brown v. Illinois*, 422 U.S. 59, 610-11 (1975) (Powell, J., concurring in part)); and when "a warrant [is] so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id*. In determining whether an officer relied upon a warrant in good faith or whether one of the exceptions to that general rule applies, a reviewing court is not "limited to the sworn, written facts set forth in the four corners of the search warrant affidavit [,]" *Adams v. Commonwealth*, 275 Va. 260, 268 (2008), but rather, must "look to the totality of the circumstances including what [the executing police officers] knew but did not include in [the] affidavit . . . [,]" *id*. at 270 (alterations in original) (quoting *United States v. Martin*, 833 F.2d 752, 756 (8th Cir. 1987)).

In challenging the trial court's finding that officers relied upon the search warrant in good faith, appellant here does not challenge the truth of the averments in the search warrant affidavit or assert that the issuing magistrate abandoned his role as a neutral and detached arbiter. Rather, his contention is that the affidavit was so lacking in probable cause that no reasonable officer could have believed the resulting search warrant to be valid.

Central to both appellant's argument that the search warrant should have not issued and that an officer could not rely upon it is his contention that the affidavit fails to establish that a crime had occurred. He argues that the affidavit does nothing more than establish that there was

a fire at the home and that a dead body was found at the scene of the fire. Coupling this with the presumption that fires are presumed accidental unless evidence indicates otherwise, *see Poulos*, 174 Va. at 500, he contends that neither the magistrate nor any officer could believe that the affidavit set forth sufficient facts to establish probable cause to believe the described crime, arson, had occurred. We disagree.

We note that in determining whether an affidavit sets forth probable cause, a *magistrate* is faced with "[t]he task of . . . mak[ing] a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that . . . evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. In doing so, the *magistrate* may draw reasonable inferences from the facts alleged in the affidavit. *Gwinn v. Commonwealth*, 16 Va. App. 972, 975 (1993). Because a finding of probable cause does not require finding that it is "more likely true than false[,]" *Slayton*, 41 Va. App. at 106 (quoting *Brown*, 460 U.S. at 742), that a crime has been committed, a *magistrate* "need only conclude that it would be reasonable to" believe that a crime may have been committed and that there may be "evidence [of that crime] in the place indicated in the affidavit[,]" *Gwinn*, 16 Va. App. at 975.

Having detailed the standard for a magistrate to issue a warrant, we note that, by definition, a lesser standard applies to finding that an officer relied upon an issued search warrant in good faith. A finding that an affidavit failed to provide a sufficient basis for a magistrate to find probable cause "does not . . . mean that the affidavit was so entirely lacking of indicia of probable cause that a police officer could not have harbored an objectively reasonable belief in the validity of the warrant." *Anzualda v. Commonwealth*, 44 Va. App. 764, 781 (2005) (*en banc*); *see also United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002) (recognizing that if the same standard applied to both the issuing magistrate and the belief of the relying officer the good faith "exception would be devoid of substance" and that an officer's good faith reliance on a

search warrant requires "a less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause in the first place").

The trial court found that, given the totality of the circumstances, Noel had "'an objectively reasonable belief that the issuing magistrate had probable cause to issue the search warrant.'" (Citation omitted). We agree.

Prior to seeking the warrant, Noel, in the course of his duties, went to the scene. He was at the home for approximately one hour. During that time, he learned that appellant and his wife lived at the home, that there had been a fire at the home, that a dead body had been found inside the home, and that the fire largely was confined to the area around the dead body. He became aware that appellant and Mrs. Grangruth were the only residents of the home and that Mrs. Grangruth was disabled and largely immobile. He was told that appellant, who was Mrs. Grangruth's primary caretaker, was not present and was not answering his cell phone, which was unusual. Noel's superior officer, who was at the scene when Noel arrived, informed Noel that the case was being investigated as an arson and instructed Noel to obtain a search warrant.

Armed with this information, Noel sought the warrant. Although the affidavit lacked detail, a reasonable reading of it makes clear that the police were investigating the scene of a fire where a dead body had been found as an arson. All of the foregoing is sufficient for Noel to have both a reasonable belief that there was probable cause to believe an arson had occurred and a reasonable belief that the search warrant issued by the magistrate to investigate that possibility was valid.

In arguing the contrary, appellant relies on the presumption that a fire is accidental and not arson. *See Poulos*, 174 Va. at 500. As noted above, in the probable cause context, the presumption simply does not bear the weight appellant places upon it. Because "probable cause

requires only a probability or substantial chance of criminal activity, not an actual showing of such activity[,]" *Gates*, 462 U.S. at 245 n.13, the presumption that a fire was caused by accident does not negate a finding of probable cause. To the extent that it did, it would be nearly impossible to ever obtain a search warrant to investigate a *possible* arson because the authorities would have to prove that an arson occurred before they could obtain a warrant allowing the collection of evidence that might sustain that proof. Simply put, the existence of the presumption did not prevent a reasonable officer in Noel's position from forming a reasonable belief that there was probable cause to believe an arson had occurred or that he could rely upon the search warrant issued by the magistrate in this case.

## CONCLUSION

Finding no error in the trial court's denial of appellant's motion to suppress, we affirm the judgment of the trial court.

*Affirmed.*